# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**                                                    SUPERIOR COURT
                                                                     CIVIL ACTION
                                                                     NO. 1784CV02900

DAVID E. PRADO, as Personal Representative of the Estate of Devon Prado,

vs.

THOMAS M. HODGSON, as Sheriff of Bristol Count, and others[1]

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The defendants, Thomas M. Hodgson, as Sheriff of Bristol County, in his official capacity (the Bristol County Sheriff's Office or "BCSO"), the Commonwealth of Massachusetts (the "Commonwealth"), Correctional Psychiatric Services, P.C. ("CPS"), and Officers Christine B. Fortin, Glenn Taber, and Bruce Duarte (the "Officers"), have all moved for summary judgment on various counts. This matter arises from Devon Prado's incarceration and subsequent suicide in September 2014. Ms. Prado's father, David Prado, brought the present action as personal representative of the estate of Ms. Prado against each of the named defendants for their conduct leading up to Ms. Prado's suicide. For the reasons explained herein, CPS's motion for summary judgment (Paper No. 82) is **DENIED**, the BCSO and the Commonwealth's motion for summary judgment (Paper No. 87) is **DENIED**, and the Officers' motion for summary judgment (Paper No. 89) is **ALLOWED**.

## BACKGROUND

On September 5, 2014, Ms. Prado was arrested and charged with breaking and entering at night with intent to commit a felony, vandalizing property, malicious destruction of property, and

---

[1] Commonwealth of Massachusetts, Correctional Psychiatric Services, P.C., Christine B. Fortin, Glenn Taber, and Bruce Duarte

several drug possession charges. As a result of these charges, Ms. Prado was transferred to the Bristol County House of Corrections ("BHC") on September 8, 2014, as a pretrial detainee.

At all relevant times hereto, Correctional Psychiatric Services, P.C. ("CPS") had contracted with the Bristol County Sheriff's Office ("BCSO") to provide comprehensive health services to inmates, detentionees, and prisoners at the BCSO correctional and detention facilities, including the BHC. The services CPS was to provide included medical, mental health, dental, laboratory, pharmaceutical, hospitalization / in-patient care, outpatient / medical clinic care, and physician specialty care. The contract does not identify any Bristol County inmate as a third-party beneficiary.

Ms. Prado's intake was completed by CPS employee Meaghan Black, LPN. During her intake, Ms. Prado reported that she did not take any prescribed medications, that she had a psychiatric illness (bipolar disorder), that she used one gram of heroin weekly prior to her arrest, that she had not detoxed, and that she did not have suicidal ideations. Ms. Prado also reported that she had been hospitalized in-patient at High Point Treatment Center in January 2014 with a dual diagnosis for mental health treatment and substance abuse. As a result of some of Ms. Prado's responses to intake questions concerning her mental health, she was referred for a mental health evaluation. Nevertheless, Ms. Prado was initially cleared for the general population unit. Ms. Prado did not receive a mental health evaluation at any point between her intake on September 8, 2014 and her death four days later.

Ms. Prado had been incarcerated earlier, in February 2014, and underwent a similar procedure. Intake and medical records from that February 2014 incarceration were available to CPS staff, including Nurse Black, but not BCSO staff due to prohibitions contained in BCSO and CPS policies.

The following day, September 9, 2014, BHC Sergeant Christine Fortin, Sergeant Glenn Taber, and Lieutenant Bruce Duarte (the "Officers") learned from BHC inmates that Ms. Prado had smuggled drugs into the BHC and that she had shared them with her cellmates on the night of September 8, 2014. The Officers searched Ms. Prado's cell and discovered eight bags of heroin in her belongings. Then, the Officers handcuffed and shackled Ms. Prado and "hands on" transported Ms. Prado to the dispatch area.

Once in the dispatch area, Officers strip and body cavity searched Ms. Prado, finding one bag of a brown, powdery substance in her vagina. Officers allowed Ms. Prado to dress but performed an additional strip search before placing Ms. Prado alone in a cell wearing only a "Ferguson johnny". Ms. Prado was also placed under constant "drug eyeball watch" by corrections officers, who observed, recorded, and sifted Ms. Prado's excretions for three bowel movements. No additional contraband was discovered throughout this process.

When Ms. Prado's drug eyeball watch concluded on September 10, 2014, Fortin and BCSO Captain Perry met with Ms. Prado and informed her that she was being charged with three additional felonies. They then questioned her concerning the drugs discovered in her belongings and on her person the previous day. Ms. Prado denied possessing as many socks as Fortin alleged contained drugs and refused to speak with them further.

That day, the BCSO notified Ms. Prado that she had been cleared for solitary confinement. BCSO policy required that a qualified medical assessment be performed before an inmate such as Ms. Prado could be segregated. That afternoon, Ms. Prado was taken to CPS employee Virginia Rego, LPN for such a segregation assessment. Nurse Rego asked a number of questions, listed on a one page form, but did not review Ms. Prado's medical chart or her two

3

intake evaluations. Nurse Rego also did not know the reason for Ms. Prado's segregation because CPS staff are not provided that information and have no access to BCSO corrections records.

Immediately after Nurse Rego's assessment, Ms. Prado was transported to solitary confinement. Eight minutes after that, the corrections officer on duty found Ms. Prado in possession of a torn bed sheet and wrote a disciplinary report concerning the incident. The corrections officer did not refer Ms. Prado for mental health evaluation as a result of that incident. Though BCSO were trained extensively in suicide risk assessment and prevention, they did not have access to inmate medical records for use in evaluating suicide risk.

On September 11, 2014, CPS employee Nicole Hallahan, LPN checked on Ms. Prado while Ms. Prado was in segregation. Nurse Hallahan did not review segregated inmates' charts before checking on them, and she did not fill out any kind of checklist in performing her rounds. Nurse Hallahan, accompanied by a BCSO officer, asked Ms. Prado whether she needed any medical, dental, or mental health services. Ms. Prado responded in the negative, and Nurse Hallahan noted Ms. Prado's response on a graph. CPS staff such as Nurse Hallahan were not required to inquire as to suicide risk factors, stressors, mental health or drug addiction history, or the reason for solitary confinement. Within ten minutes, Nurse Hallahan had completed her rounds of all twelve solitary confinement inmates.

Ms. Prado met with her attorney that day, and upon returning from that meeting, was again strip searched. During the meeting, Ms. Prado's legs had been shackled, with a metal chain around her waist.

On the morning of September 12, 2014, Ms. Prado was found hanging in her room. She had used a torn sheet to create a makeshift rope, which she had tied from her bed to her neck. When first responders arrived, Ms. Prado did not have a pulse. BCSO and CPS staff attempted to

revive Ms. Prado by using an AED defibrillator as part of their CPR efforts but were unsuccessful. Ms. Prado was then transferred by EMTs to St. Luke's Hospital, where she was later pronounced dead.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56; *Cassesso v. Commissioner of Corr.*, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Commc'ns Corp.*, 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991).

### A.   CPS's Motion for Summary Judgment

CPS has moved for summary judgment on Mr. Devon's count 16 for breach of contract / third party liability. In support thereof, CPS argues that Mr. Devon's breach of contract claim is duplicative of Mr. Devon's wrongful death claim and thus must be dismissed. CPS further argues that there is no basis for third-party beneficiary status in this matter because Ms. Prado was not an intended beneficiary of the contract between CPS and BCSO. The court addresses each argument below.

5

### 1.   Duplicative claim

To begin, though both Mr. Prado's wrongful death and his third-party beneficiary claims both target CPS's duty of care, they do so through distinct legal theories. Though the two claims are closely related, Massachusetts law allows parties to pursue relief on alternative legal theories. See *Hillside FXF, LLC v. Premier Design + Build Grp., LLC*, 2016 Mass. Super. LEXIS 372 at *6 (2016) ("Although [the breach of contractual provisions requiring duty of care] may very well overlap with the negligence claim, Massachusetts case law does not prohibit a plaintiff from relying on different legal theories."). Here, Mr. Prado may proceed under alternate legal theories. The jury should be instructed accordingly to prevent the possibility of duplicative recovery.

### 2.   Third-party beneficiary claim

Courts beyond the Commonwealth have held that inmates benefitting from contracts whose purpose is to provide services to inmates are third-party beneficiaries to those contracts. See *Ogunde v. Prison Health Servs.*, 274 Va. 55, 63-64 (2007) (contract between medical service provider and Virginia Department of Corrections "clearly and definitely" indicated that they intended to provide inmates, including the plaintiff, a benefit where it stated that its purpose was to "provide cost effective, quality inmate health care services to inmates"); *Rathke v. Corrections Corp. of Am.*, 153 P.3d 303, 310 (Alaska 2007) (prisoners were intended third-party beneficiaries of contract between Alaska correction department and private company housing inmates). Further, as Mr. Prado correctly asserts, these cases have been cited favorably by Massachusetts courts, even if they have not been adopted. See *Kilburn v. Dep't of Corr.*, 2008 Mass. App. Unpub. LEXIS 749 at *10, fn. 6 (2008); *Sullivan v. Corr. Med. Servs., Inc.*, 2008 Mass. App. Unpub. LEXIS 446 at *8 (2008). As such, the court is persuaded that CPS is not entitled to judgment as a matter of law on the plaintiff's third-party beneficiary claim.

B.  **The Commonwealth of Massachusetts and Sheriff of Bristol County's Motion for Summary Judgment**

The Commonwealth of Massachusetts and the BCSO[2] have moved for summary judgment on Mr. Prado's counts for wrongful death (count 1) and conscious pain and suffering (count 2). As grounds therefore, they argue that the BCSO is immunized from suit by discretionary immunity under G.L. c. 258, § 10(b) and that the BCSO is immunized from suit by G.L. c. 258, § 10(j) because it was not the original cause of Ms. Prado's harm. For the reasons outlined below, BCSO's arguments fail.

1.  **G.L. c. 258, § 10(b)**

The discretionary immunity statute provides, in relevant part, as follows:

The provisions of sections one to eight, inclusive, shall not apply to: —

. . .

(b) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused;

. . . .

G.L. c. 258, § 10(b). The exception distinguishes between "discretionary" acts, defined as "conduct that involves policy making or planning," and "functionary" acts, that is, those actions that simply implement established policy. *Harry Stoller & Co. v. Lowell*, 412 Mass. 139, 141-142 (1992).

To aid in applying this general language, courts have applied a two-step analysis. Firstly, courts decide "whether the governmental actor had any discretion at all as to what course of conduct to follow." *Id.* at 141. If the actor's conduct is prescribed by statute, regulation, or other

---

[2] As the only remaining count against the Sheriff of Bristol County is against him in his official capacity, the two defendants are, for practical purposes, the Commonwealth of Massachusetts.

7

readily ascertainable standard, the government has no discretion, and the exception does not apply. *Id.* If the first step does not resolve the issue, "[t]he second and far more difficult step is to determine whether the discretion that the actor had is that kind of discretion for which § 10(b) provides immunity from liability." *Id.* Although almost every act involves some degree of discretion, "[t]he discretionary function exception is narrow, 'providing immunity only for discretionary conduct that involves policy making or planning.'" *Greenwood v. Easton*, 444 Mass. 467, 470 (2005), quoting *Harry Stoller & Co.*, 412 Mass. at 142. Discretionary acts do not include those that involve only the "carrying out of previously established policies or plans." *Barnett v. Lynn*, 433 Mass. 662, 664 (2001), quoting *Whitney v. Worcester*, 373 Mass. 208, 218 (1977).

While the question is close, because the discretionary immunity statute limits its immunity to the "carrying out of previously established policies or plans," see *Barnett*, 433 Mass. at 664, quoting *Whitney*, 373 Mass. at 218, BCSO's alleged negligent implementation of "previously established policies or plans" here is not protected. The fact that the BCSO employed a medical director who lacked clinical training may suggest negligent conduct not protected by the statute. The same argument applies to BCSO's failure to coordinate the distribution of material health care information between the BCSO and CPS and also BCSO's use of beds which presented suicide hazards. Each instance may constitute the negligent implementation of existing policies, rather than discretionary establishment of such policies. For at least these reasons, the discretionary immunity statute does not bar liability here.

2.   **G.L. c. 258, § 10(j)**

The "original cause" immunity statute provides, in relevant part, as follows:

The provisions of sections one to eight, inclusive, shall not apply to: —

8

> . . . .
>
> (j) any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer. This exclusion shall not apply to:
>
>> (1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance; and
>>
>> (2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and
>>
>> (3) any claim based on negligent maintenance of public property;
>>
>> (4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee.
>
> . . . .

G.L. c. 258, § 10(j). The purpose of this section is to preclude liability where the government fails to prevent harm from a privately created hazard, as opposed to a hazard that it has caused. See *Brum* v. *Dartmouth*, 428 Mass. 684, 691-696 (1999) (town not liable for stabbing of student based on claim that town failed to protect student from known threat); see also *Stahr* v. *Lincoln Sudbury Regional High Sch. Dist.*, 93 Mass. App. Ct. 243, 247 (2018). "[F]or the 'original cause' language under § 10(j) to apply, 'the act must have materially contributed to creating the specific 'condition or situation' that resulted in the harm." *Cormier* v. *Lynn*, 479 Mass. 35, 40 (2018), citing, inter alia, *Brum*, 428 Mass. at 692.

The BCSO argues that because Ms. Prado's death was caused by suicide, the BCSO could not have been the "original cause" of her harm, so Section 10(j) applies to bar liability. Mr. Prado responds that the affirmative acts of BCSO—both at the higher levels related to the

9

negligent implementation of suicide prevention policies and at the lower levels relating to the treatment of Ms. Prado in the days prior to her death—contributed to Ms. Prado's suicide, so Section 10(j) does not apply to bar liability.

Viewing the facts in the light most favorable to Mr. Prado, the claims against the BCSO are not barred by Section 10(j). The BCSO took affirmative action when it placed Ms. Prado in segregation and strip searched her multiple times, all without the mental health evaluation she was prescribed during intake. See *Baptista v. Bristol Cnty. Sheriff's Dep't*, 100 Mass. App. Ct. 841, 856 (2022) (placing "extremely intoxicated" civil detainee in cell with other arrestees was affirmative act that materially contributed to creating condition or situation that resulted in harmful consequences); see also *Devlin v. Commonwealth*, 83 Mass. App. Ct. 530, 532-533 (2013) (placing patient civilly committed for alcoholism with high-risk inmates was an original cause of the plaintiff's assault). Further, when BCSO officers discovered Ms. Prado with a torn sheet in solitary confinement, creating a kind of fabric rope, the BCSO had reason to suspect that Ms. Prado could pose a suicide risk. See *Kice v. Hodgson*, Bristol Super. Ct., Civil Action No. 1873CV00189, Memorandum of Decision and Order on Defendants' Motion for Summary Judgment at 4-6 (Yessayan, J., Sept. 29, 2021) (jury could find that BCSO should have known of inmates suicide risk from past suicide attempt and suicidal statements). Considering the foregoing, the BCSO and the Commonwealth are not entitled to judgment as a matter of law.

### C.     Fortin, Taber, and Duarte's Motion for Summary Judgment

Finally, officers Christine Fortin, Glenn Taber, and Bruce Duarte (the "Officers") move for summary judgment on Mr. Prado's claims of excessive force (count 15) and civil conspiracy (count 17). Because the plaintiff is unable to locate the only witnesses available to dispute the

facts alleged by the Officers, the plaintiff does not oppose the Officers' motion. Summary judgment will accordingly enter in favor of the Officers on those two counts.

## ORDER

For the foregoing reasons, the court orders as follows:

1. CPS's motion for summary judgment is **DENIED**;

2. The Commonwealth of Massachusetts and BCSO's motion for summary judgment is **DENIED**; and

3. The Officers' motion for summary judgment as to count 15 and count 17 is **ALLOWED**.

Michael P. Doolin
Justice of the Superior Court

Date: April 11, 2023