UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANE DOE, Personal Representative   )
of the ESTATE OF N.M.,      )
              )
  Plaintiff,        )
              )
  v.          )
              )  Civil Case No. 23-cv-10358-MGM
CITY OF NORTHAMPTON,    )
              )
  Defendant.       )

<u>REPORT AND RECOMMENDATION REGARDING DEFENDANT'S
MOTION TO DISMISS</u>
(Dkt. No. 16)

ROBERTSON, U.S.M.J.

I.   INTRODUCTION

Following her daughter N.M's suicide, Jane Doe ("Plaintiff") filed suit against the City of Northampton ("Defendant" or "City"). Plaintiff alleges that the Assistant Principal of Northampton High School ("High School"), Celeste Malvezzi ("Malvezzi"), N.M.'s High School adjustment counselor, Andrea Leydon ("Leydon"), and other school employees failed to enforce the High School's anti-bullying, anti-harassment, and racial discrimination policies in violation of N.M.'s rights under the Fourteenth Amendment (Count V), failed to investigate racial discrimination, harassment, and bullying in violation of Title VI of the Civil Rights Act of 1964 (Count VI), and impermissibly chilled N.M.'s exercise of her rights under the First Amendment and art. 16 of the Massachusetts Declaration of Rights by retaliating against her for reporting bullying and harassment (Count VII). Plaintiff also asserts state law claims for negligence (Count I), negligent infliction of emotional distress (Count II), intentional infliction of emotional

1

distress (Count III), wrongful death (Count VIII), and punitive damages (Count IX).[1]  Defendant

has moved to dismiss all counts of the complaint (Dkt. No. 16).  The presiding District Judge

referred the motion for report and recommendation to the undersigned (Dkt. No. 29).  For the

reasons that follow, this court recommends that Defendant's motion be GRANTED in part and

DENIED in part.

     II.      ALLEGATIONS IN THE COMPLAINT

     N.M. was a biracial student who suffered from anxiety and post-traumatic stress disorder

(PTSD) (Compl. ¶ 19).  During the 2017-2018 school year, she attended eighth grade at a charter

school (Compl. ¶ 20).  She was scheduled to transition to the High School in September 2018

(Compl. ¶¶ 22, 24, 27).  During the summer of 2018, N.M. was bullied by a group of peer

students, including O.D., A.M., and J.F. (Compl. ¶ 23).   In August 2018, Plaintiff attended a

meeting at the High School to discuss N.M.'s Individual Education Plan ("IEP").  The IEP

provided that N.M. was to receive "instruction and support in identifying emotional responses

that created barriers and challenges to her academic activities and social interactions with peers

and adults."  Malvezzi and Leydon were present at the IEP meeting.  Plaintiff notified the school

officials that N.M. was being bullied by High School students including O.D., A.M., and J.F.

(Compl. ¶¶ 24-26).

     These same students continued to bully and harass N.M. when she started ninth grade in

September 2018.  O.D., A.M., and J.F. sent social media messages telling other students when

N.M. would enter the school or leave her classes.  Students who received the messages

frightened N.M. by blocking her path of travel and gesturing as though they were going to

---

[1] The complaint does not contain a Count IV.  Plaintiff has agreed to dismiss Counts III and IX
(Dkt. No. 20 at 1 n.1).

assault her.  A.M. told N.M. that she should not wear her hair in braids because she was not "black enough" and J.F. threatened to scar N.M's face because N.M. thought she was "too beautiful" (Compl. ¶¶ 27-32).  Plaintiff asserts on information and belief that students directed additional racial remarks at N.M. (Compl. ¶ 33).

Plaintiff and N.M. reported the threats to Defendant.  Malvezzi acknowledged that it appeared students were hanging around outside of N.M.'s math classroom.  Despite this acknowledgement, High School employees did not comply with the anti-bullying and anti-harassment policies that required them to investigate the incidents promptly, create a bullying and harassment incident report and tracking form, and establish a safety plan for N.M. (Compl. ¶¶ 9-18, 34-39).

During N.M.'s October 15, 2018 IEP team meeting, Plaintiff reported that N.M. was lonely and being bullied.  The team acknowledged that bullying was a concern and indicated that it would be addressed through N.M.'s IEP.  However, the school still failed to investigate and the bullying continued (Compl. ¶¶ 40, 41).  J.F. sent N.M a photograph of herself with Leydon that was captioned, "[Leydon] hates your guts too."  High School officials were aware of the photograph but still failed to comply with the High School's anti-bullying and anti-harassment policies (Compl. ¶¶ 42-46).  At N.M.'s February 15, 2019 IEP meeting, Plaintiff reported that N.M. was terrified to attend school because of the ongoing bullying and harassment.  The Associate Director of Student Services, David Messing ("Messing"), stated that the incidents warranted investigation as bullying, but Messing refused Plaintiff's request for a safety plan to protect N.M., indicating that safety concerns would be addressed through the IEP (Compl. ¶¶ 47-50).

On March 26, 2019, N.M. stopped attending school because the constant bullying increased her anxiety and depression (Compl. ¶ 51). N.M. attempted suicide in May 2019. During her subsequent hospitalizations, she said she was afraid to return to school and had thought it was better to die (Compl. ¶ 52). In July 2019, High School students created a website entitled "Let's Roast N.M." and bullied her on-line (Compl. ¶ 61).

The Massachusetts Department of Children and Families ("DCF") investigated N.M.'s attempted suicide. The investigation included a conversation with Leydon, who denied that Plaintiff and N.M had told the school about bullying and reported that the school had determined that rather than being bullied, N.M. was experiencing "peer on peer conflict," and that N.M. was the aggressor during the incidents. When DCF confronted Leydon about her misrepresentations, Leydon said that she was only doing what she had been told to do (Compl. ¶¶ 53-59).

When N.M. returned to school in September 2019, she was assigned to The Academy, a special program that Plaintiff was told would provide special accommodations to protect N.M. from bullying. Instead, the Academy was a behavioral program for physically aggressive students. On September 9, 2019, two students assaulted N.M., kicking her in the head and giving her a concussion. The fight was videotaped and disseminated across social media. The attack caused N.M.'s mental state to deteriorate further (Compl. ¶¶ 62-67). On September 10, 2019, the school finally implemented a safety plan for her that provided that an adult would supervise her throughout the school day to ensure her emotional and physical safety (Compl. ¶ 68).

Notwithstanding the safety plan, the bullying, harassment, and physical attacks continued. On September 19, 2019, N.M. had a verbal altercation with a student who sent N.M. inappropriate text messages. N.M. was brought to Malvezzi's office, where she made suicidal statements. Malvezzi suspended N.M. for a day (Compl. ¶¶ 71-75).

4

A month later, a male student entered N.M.'s personal space and harassed her. Although a special education teacher witnessed the incident, she did not intervene on N.M.'s behalf as required by the safety plan. N.M. asked the student to get out of her personal space and kicked the student in his steel-toed boot as she tried to leave the area. Malvezzi suspended N.M. from school for two days (Compl. ¶¶ 76-79).

In November 2019, N.M. was physically attacked again in school, after which she experienced nightmares, flashbacks, and negative thoughts (Compl. ¶¶ 81-83). On November 19, 2019, J.F. insulted and threatened N.M. while they were in class. To diffuse the situation, a teacher directed N.M. to leave the classroom. N.M. accidentally caught the teacher's arm in the door as she slammed it on her way out of the room. N.M. was again suspended from school (Compl. ¶¶ 84-86). During a meeting between N.M., Plaintiff, and Malvezzi to discuss the incident, Malvezzi noted that N.M. encountered more conflicts at school when she wore "flashy eyelashes." Malvezzi said, "I know [the eyelashes] are cultural for you" (Compl. ¶ 87).

After the November 19, 2019, incident, Plaintiff withdrew N.M. from the High School because the staff had not kept her safe. On December 15, 2019, N.M. told her mother that it was unfair that bullying prevented her from attending school and that the school was not protecting her. On January 30, 2020, N.M. broke down crying and told her mother that she did not understand why the school could not keep her safe. She took her own life later that day (Compl. ¶¶ 89-92).

III.    LEGAL STANDARD

"On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most hospitable to the plaintiff's theory, and draw all reasonable inferences from those facts in favor of the plaintiff."

*Correia v. Town of Westport*, Civil Action No. 1:16-cv-12408-ADB, 2017 WL 3940931, at *2 (D. Mass. Sept. 7, 2017) (citing *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011)).  Although detailed factual allegations are not required, a "formulaic recitation of the elements of a cause of action" is not sufficient.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "To avoid dismissal, a complaint must set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  *Correia*, 2017 WL 3940931, at *2 (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citation omitted)).  "Further, the facts alleged, when taken together, must be sufficient to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013)).

"The plausibility standard invites a two-step pavane."  *A.G. ex rel. Maddox*, 732 F.3d at 80.  "At the first step, the court 'must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).  "At the second step, the court must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal quotations and citation omitted).  "[T]he court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable."  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (internal quotations and citation omitted).

IV.     DISCUSSION

    A.     <u>Federal Claims:  Counts V, VI, and VII</u>

        1.     Count V:  Violation of 42 U.S.C. § 1983 and Fourteenth Amendment

"[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Cruz–Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000). There is no dispute that the City's employees acted under color of law. Plaintiff asserts that the City's failure to protect her from bullying and harassment violated her Fourteenth Amendment right to due process and chilled her exercise of her First Amendment rights. Courts in this district have recognized possible state-created danger claims against schools and their employees for violating students' constitutional rights to bodily integrity in circumstances comparable to those in the instant case. *See Doe v. Gavins,* Civil Action No. 22-cv-10702-ADB, 2023 WL 6296398, at *7-8 (D. Mass. Sept. 27, 2023); *Doe1 v. Boston Pub. Schs.,* Civil Action No. 17-cv-11653-ADB, 2019 WL 1005498, at *4-5 (D. Mass. Mar. 1, 2019); *Doe v. Town of Wayland,* 179 F. Supp. 3d 155, 166-69 (D. Mass. 2016). Defendant, while reserving its right to argue down the road that Plaintiff cannot show the violation of any cognizable federal constitutional or statutory right, does not, at the motion to dismiss stage, contest that the complaint adequately alleges a violation or violations of N.M.'s federally protected rights (Dkt. No. 17 at 12 & n.10). Accordingly, with the City as the sole defendant, the court turns to the question of whether the complaint sufficiently alleges a basis for municipal liability.

Under *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978), "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis omitted). A municipality may, however, be liable for an employee's constitutional violation "when 'execution of [the municipality's] policy or custom . . . inflict[ed] the injury.'" *Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (alterations in original) (quoting

*Monell*, 436 U.S. at 694). "[T]here must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "In order to establish an official custom, plaintiffs must first plausibly allege that the custom is 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Gavins,* 2023 WL 6296398, at *9 (quoting *Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022)). "Evidence of a single incident of a constitutional deprivation 'is insufficient, in and of itself, to establish a municipal "custom or usage" within the meaning of *Monell*.'" *Id.* (quoting *Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 16–17 (1st Cir. 1995)). "Evidence of 'multiple instances of misconduct' that suggest a 'systemic pattern of activity,' however, may support an inference of a municipal custom." *Id.* (quoting *Town of Wayland*, 179 F. Supp. 3d at 172–73).[2]

Plaintiff claims that High School employees followed a municipal custom or policy of misclassifying bullying and harassment as peer-on-peer conflict in violation of the High School's written anti-bullying and anti-harassment policies to avoid their duties to investigate and protect student victims of harassment and bullying.  Defendant seeks dismissal on the ground that the complaint relies on labels and conclusions rather than factual allegations of a policy or custom (Dkt. No. 17 at 12).  While the allegations are limited to the school's actions and inactions as to

---

[2] Plaintiff alleged generally that the City failed to train its employees to properly investigate allegations of racial discrimination, harassment, and bullying as an additional basis for her claims in Count V (Compl. ¶ 114).  As the City points out, the complaint "fails to elucidate the generalized references [to training deficiencies] with sufficient facts or examples to raise the allegations above the speculative level," *Santiago v. Bloise*, 741 F. Supp. 2d 357, 363 (D. Mass. 2010), and Plaintiff does not press the failure to train theory in her opposition to Defendant's motion to dismiss (Dkt. No 20 at 6-8).  Accordingly, the court should treat this theory as waived for purposes of the motion to dismiss.  *See Trindade v. Grove Servs., Inc.*, Civil Action No. 19-cv-10717-ADB, 2020 WL 6566509, at *4 (D. Mass. Nov. 9, 2020) (citing additional cases).

N.M. rather than a group of students, the complaint alleges a series of failures and omissions over some eighteen months.  Plaintiff alleges repeated occasions on which N.M was bullied, harassed, or physically assaulted, that N.M was seriously injured more than once, and that she and N.M reported these events to appropriate school employees.  She alleges that, instead of investigating these reports of bullying, harassment, and assault, school employees consistently misclassified and minimized the complaints, including lying to DCF, to avoid implementing and ensuring compliance with the school's anti-bullying and anti-harassment policies and the state's laws that were meant to protect N.M. and other students (Compl. ¶¶ 10-18, 28-35, 39-50, 53-59, 64, 81).  "This systemic pattern of activity compels the Court to find [Plaintiff's] allegations 'more akin to the serial misconduct cases than to cases implicating the single incident rule.'" *Town of Wayland*, 179 F. Supp. 3d at 173 (quoting *Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225, 239 (1st Cir. 2005), *abrogated on other grounds by Jennings v. Jones,* 587 F.3d 430 (1st Cir. 2009)); *see also Office of Pub. Guardian v. Elliot Hosp.*, 626 F. Supp. 3d 520, 532 (D.N. H. 2022) (although the plaintiff had not alleged that others were subjected to the defendant's allegedly unconstitutional customs or practices, the plaintiff's allegation of a systemic failure over an extended period related to his own incarceration sufficiently pled customs or practices for purposes of possible governmental liability).  The complaint indisputably alleges that the City's practice of misclassifying and ignoring bullying and harassment incidents caused N.M. physical and emotional harm (Compl. ¶¶ 28-35, 39-59, 64, 66, 67, 71-86).  *See Lewis v. Blue Springs Sch. Dist.,* No. 4:17-cv-00538-NKL, 2017 WL 5011893, at *1, *12 (W.D. Mo. Nov. 2, 2017) (denying motion to dismiss where the school violated a student's substantive due process rights through its custom of failing to stop "severe and pervasive bullying" that "caused or contributed to" the student's suicide); *see also Gavins,* 2023

WL 6296398, at *9-10 (denying motion to dismiss based on school's failure to comply with anti-bullying and anti-harassment policies).

The case of *Abdisamad v. City of Lewiston,* 960 F.3d 56 (1st Cir. 2020), on which the City relies, is distinguishable (Dkt. No. 21 at 5-6). In *Abdisamad*, the plaintiff alleged that the defendant's failure to follow its protocols concerning water safety caused his son's death during a school swimming trip. *See id.* at 57, 60. The complaint in this case alleges more than the High School's failure to follow its anti-bullying and anti-harassment policies on a single occasion. Instead, Plaintiff contends that the City violated N.M.'s due process rights by a deliberate and sustained policy or custom of mischaracterizing bullying and harassment to avoid the substantial burdens of compliance with the High School's official written policies against bullying and harassment, which included investigation, disciplinary action, and implementation of safety plans for students at risk (Compl. ¶¶ 13-18, 48, 54-59, 94).

The court acknowledges that Plaintiff's allegations concerning municipal policy or custom are thin, and Plaintiff "will have to overcome significant issues of proof" if she is to avoid summary judgment or prevail at trial. *Gavins*, 2023 WL 6296398, at *10. For purposes of a motion to dismiss, however, Plaintiff has adequately pled facts that could give rise to municipal liability. This court recommends against dismissal of Count V at this time.

2.      Count VI: Violation of Title VI of the Civil Rights Act of 1964

"'Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin.'" *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230 (D. Mass. 2015) (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012)). "'[I]n the educational setting, a school district is liable for intentional discrimination when it has

been "deliberately indifferent" to teacher or peer harassment of a student.'" *Id.* (alteration in original) (quoting *Zeno,* 702 F.3d at 665).

> "[T]o establish liability in connection with . . . harassment," a plaintiff must show: (1) "that he or she was subject to 'severe, pervasive, and objectively offensive' [ ] harassment . . ." on the basis of race, color, or national origin; (2) "that the harassment caused the plaintiff to be deprived of educational opportunities or benefits"; (3) "[the funding recipient] knew of the harassment (4) in its programs or activities"; and "(5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances."

*Id.* (first, third, and fourth alterations in original) (quoting *Thomas v. Springfield Sch. Comm.,* 59 F. Supp. 3d 294, 301 (D. Mass. 2014)); *see Zeno*, 702 F.3d at 665-66 (extending Title IX's deliberate indifference framework to Title VI). "The First Circuit has suggested that a school might be deliberately indifferent if it had notice of . . . harassment or discrimination and did nothing or failed to take additional measures after its initial measures were ineffective." *Harrington v. City of Attleboro,* 172 F. Supp. 3d 337, 345 (D. Mass. 2016) (citing *Porto v. Town of Tewksbury,* 488 F.3d 67, 74 (1st Cir. 2007)).

Defendant argues that a single comment by Malvezzi cannot support a racial discrimination claim (Dkt. No. 17 at 14-16). For her part, Plaintiff argues that she has pointed to two specific instances of harassment or discrimination based on N.M.'s race, alleged on information and belief that there were other such instances, and repeatedly reported that N.M. was being bullied (Compl. ¶¶ 31, 33, 34, 42, 43, 47, 87, 120, 124-25)). It is a fair inference at this stage that the comment that N.M. was not black enough to wear her hair in braids constituted harassment based on race. *See M.R. v. Burlington Area Sch. Dist.,* Case No. 21-CV-1284-JPS, 2023 WL 3510642, at *16 (E.D. Wis. May 17, 2023) (in a Title VI action, "mean comments" about plaintiff's hair were deemed racial in nature or could be construed as racial in nature). Similarly, Malvezzi's comment about N.M.'s flashy eyelashes could be construed as racial in

11

nature.  It is a close call whether, based on these two incidents, Plaintiff has sufficiently alleged

severe, pervasive, and objectively offensive racial harassment by peers and school employees.

*See D.J. ex rel Hughes v. Sch. Bd. of Henrico Cty.,* 488 F. Supp. 3d 307, 335 (E.D. Va. 2020)

(two race-driven incidents were sufficient to allege a hostile environment).  The First Circuit has,

however, acknowledged a possibility that "in some cases one could 'use a substantial amount of

arguably [racially]-neutral harassment to bolster a smaller amount of [race]-based conduct'" to

support an inference of pervasive racially motivated harassment.  *Morgan v. Town of Lexington,*

823 F.3d 737, 745 (1st Cir. 2016).  There is no doubt that Plaintiff has alleged severe and

pervasive bullying and harassment with devastating consequences for N.M., that she and N.M.

repeatedly reported the problems N.M. was having at school, and that the school was indifferent

to her plight.  *See M.L. v. Concord Sch. Dist.,* 86 F.4th 501, 511 (1st Cir. 2023) (an institution

may be deliberately indifferent if its "response to the harassment, or lack thereof, [was] 'clearly

unreasonable in light of the known circumstances.'  The . . . response must have caused the

student to undergo harassment or make the student vulnerable to it.") (quoting *Davis v. Monroe*

*Cty. Bd of Educ.,* 526 U.S. 629, 648 (1999)).  With N.M. unavailable to clarify the reasons for

the bullying and harassment, or its specific content, Plaintiff should be given the opportunity to

clarify the extent of a possible factual basis for the Title VI claim in discovery.

At the hearing on its motion to dismiss, the City additionally argued that Plaintiff's Title

VI claim should be dismissed pursuant to *Cummings v. Premier Rehab Keller, P.L.L.C.,* 596

U.S. 212 (2022), because the remedy she seeks – damages for emotional distress – is not

available.[3]  In *Cummings,* the Court held that "emotional distress damages are not recoverable

---

[3] Defendant did not raise its *Cummings* defense until the hearing on its motion to dismiss.  To avoid unfairness and the question of a possible waiver of a substantial legal issue by Defendant at the motion to dismiss stage, the court directed the parties to file supplemental briefs

under the Spending Clause antidiscrimination statutes," including Title VI and Title IX.  *Id.* at 218, 230.  Subsequently, courts have concluded that *Cummings* applies to Title VI claims.  *See Rollins v. Kiffin,* No. 3:23-cv-00356-MPM-RP, 2024 WL 386925, at *8 (N.D. Miss. Jan. 31, 2024) (dismissing Title VI claim because plaintiff only sought damages for emotional distress); *Chaney v. E. Cent. Indep. Sch. Dist.,* SA-21-CV-01082-FB, 2022 WL 17574080, at *6 (W.D. Tex. Dec. 9, 2022) (dismissing Title VI claim because that law does not permit recovery of emotional distress damages).

Plaintiff argues that Count VI should not be dismissed in its entirety because she is seeking damages in addition to those for emotional distress (Dkt. No. 34 at 2).  In addition to compensation for the "physical harm" that N.M. allegedly suffered as a result of the Title VI violation (Compl. ¶ 126), Plaintiff states that she will seek damages for N.M's lost educational opportunities and future lost wages (Dkt. No. 34 at 2-3).  "*Cummings* does not bar [plaintiff's] Title IX claims wholesale where she seeks remedies beyond emotional distress damages."  *Doe v. Town of N. Andover*, Civil Action No. 1:20-cv-10310-IT, 2023 WL 3481494, at *12 (D. Mass. May 16, 2023).  *See also Chaitram v. Penn Med.-Princeton Med. Ctr.,* Civil Action No. 21-17583 (MAS) (TJB), 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022) (denying motion to reconsider denial of motion to dismiss Rehabilitation Act and Affordable Care Act claims because compensatory damages under a lost opportunity theory were available); *Doe ex rel. Doe v. City of Pawtucket,* 633 F. Supp. 3d 583, 590 (D.R.I. 2022) (medical expenses are recoverable under Title IX post-*Cummings*).  On the present limited record, it is difficult to tell whether

---

addressing, *inter alia*, the import of *Cummings*, and both parties did so (Dkt. Nos. 34, 35).  Plaintiff "was not 'deprive[d] . . . of an opportunity to respond in writing on the issue,'" *Triantos v. Guaetta & Benson, LLC,* 91 F.4th 556, 562 (1st Cir. 2024) (alterations in original) (quoting *Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788 F.3d 25, 29 (1st Cir. 2015)), and there is no reason to treat the question as waived by Defendant.

Plaintiff has a basis for recovery after *Cummings*.  This issue should be resolved on a more complete factual record.

For the foregoing reasons, this court recommends against dismissal of Count VI, except insofar as Plaintiff seeks damages for emotional distress.

   3.   Count VII:  Retaliation under the First Amendment and art. 16 of
       the Massachusetts Declaration of Rights

Plaintiff acknowledges that "'a litigant complaining of a violation of a constitutional right [by a municipal official] does not have a direct cause of action under the United States Constitution but [rather] must utilize 42 U.S.C. § 1983,'" *Wilson v. Moreau*, 440 F. Supp. 2d 81, 92 (D.R.I. 2006), *aff'd*, 492 F.3d 50 (1st Cir. 2007) (second alteration in original) (citation omitted).  She points out that the complaint asserts a § 1983 claim and that the issues are fully briefed, and asks that the court consider the claim as though it were properly pled.  This court agrees that, where Defendant has been given "'fair notice'" of the claim and has responded to it (Dkt. No. 17 at 16-18), judicial economy warrants considering Plaintiff's First Amendment claim in conjunction with her properly pled § 1983 claim (Compl. ¶¶ 113-19; Dkt. No. 20 at 7, 10-11). *Coy Phelps v. Local 0222,* Civil Action No. 09-11218-JLT, 2010 WL 3342031, at *5 (D. Mass. Aug. 20, 2010) (citation omitted).  *See* Fed. R. Civ. P. 8(a).

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out . . . ." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government may not punish a person or deprive him or her of a benefit based on his or her "constitutionally protected speech").  "The rationale for the First Amendment retaliation doctrine is that 'constitutional violations may arise from the deterrent, or "chilling," effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights.'"

*Town of Chelmsford*, 267 F. Supp. 3d at 300 (quoting *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996)).

> Under the First Amendment, retaliation claims proceed in two stages.  A plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action. "The defendant may then avoid a finding of liability by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  *Powell* [*v. Alexander*], 391 F.3d [1,] 17 [1st Cir. 2004].

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (first alteration in original) (citations omitted).  Plaintiff has adequately alleged that N.M. engaged in constitutionally protected conduct by reporting incidents of bullying, harassment, and physical assault to Leydon, Malvezzi, and others (Compl. ¶¶ 25, 26, 34, 35, 40-43, 47, 68, 72-87).  *See Town of Chelmsford,* 267 F. Supp. 3d at 300.

Defendant submits that N.M. has not alleged a causal connection between her reports of bullying, and any retaliatory response (Dkt. No. 17 at 17).  "In th[e] employment context, the First Circuit has stated that an adverse action is anything that 'would deter a reasonably hardy individual from exercising his constitutional rights.'"  *Id.* (citing *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011)).

> A campaign of informal harassment, for example, would support a First Amendment retaliation claim if the alleged harassment would have such a chilling effect.  Even "relatively minor events" can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights.

*Barton,* 632 F.3d at 29 (citations omitted).  The First Circuit and other sessions of this court have applied this standard in cases alleging a school employee's retaliation against students or parents who report instances of bullying.  *See Town of Chelmsford,* 267 F. Supp. 3d at 301-02; *Pollard,* 132 F. Supp. 3d at 226; *see also D.B.,* 675 F.3d at 43 (parents asserted their disabled child's

rights to a FAPE). In *Town of Chelmsford*, the court held that a school administrator's deliberate indifference to reports of severe bullying and harassment can be sufficiently adverse to state a claim for First Amendment retaliation. *See Town of Chelmsford,* 267 F. Supp. 3d at 301. Here, Plaintiff alleges that the school administrators took no action when they learned that a student had sent N.M. a picture of N.M.'s counselor with a caption taunting N.M. that the counselor hated N.M. (Compl. ¶¶ 42, 43). Further, according to the complaint, school administrators ignored Plaintiff's and N.M.'s repeated reports of threats and bullying (*e.g.*, Compl. ¶¶ 28-35, 39-43, 47-50, 54-59) and Plaintiff's request for a safety plan (Compl. ¶ 50).

Plaintiff further alleges that, after the school was left with no choice but to implement a safety plan, school staff members failed to protect N.M. and Malvezzi repeatedly disciplined her by suspension for confrontations that were precipitated by peer bullying and physical assaults on N.M. (Compl. ¶¶ 68, 71-86, 88). The City argues that there was no causal connection between the discipline and any retaliatory animus and, even if there was, N.M.'s behavior justified the suspensions (Dkt. No. 17 at 18). The suspensions qualify as adverse action. Accepting Plaintiff's allegations as true, Malvezzi knew N.M. was responding to provocations from peers and could not control her responses due to her emotional state and the limitations addressed by her IEP (Compl. ¶¶ 72-86). Furthermore, based on their timing – the first suspension occurred nine days after the safety plan was put in place – it is plausible that they were causally linked to N.M.'s constitutionally protected activity of reporting bullying and harassment (Compl. ¶¶ 68, 75). *See Bell v. Potter,* 234 F. Supp. 2d 91, 99 (D. Mass. 2002) ("the closer the adverse action is to the protected activity, the stronger the inference of causation."); *see also Mariani–Colon v. Dept. of Homeland Sec. ex rel. Chertoff,* 511 F.3d 216, 224 (1st Cir. 2007) (a two month gap between the protected activity and an adverse action was close enough to sustain a causal

connection).  Consequently, the complaint sufficiently states a claim for First Amendment retaliation.

Defendant challenges Plaintiff's ability to bring a direct cause of action under art. 16 (Dkt. No. 17 at 30).  "Whether a claim can be brought directly under the Massachusetts Declaration of Rights or whether it must be brought pursuant to the MCRA is an 'open question.'"  *Humphrey v. Comoletti*, Civil Action No. 1:15-cv-14170-ADB, 2017 WL 1224539, at *8 n.6 (D. Mass. Mar. 31, 2017) (quoting *Tomaselli v. Beaulieu*, 967 F. Supp. 2d 423, 448 (D. Mass. 2013), *aff'd*, No. 13-2218 (1st Cir. Dec. 16, 2014)).  Although there is some authority for requiring claims to be brought pursuant to the MCRA, *see Leaver v. Life Care Ctrs. of Am., Inc.*, Civil Action No. 23-10901-MJJ, 2024 WL 218467, at *4 n.8 (D. Mass. Jan. 19, 2024); *Sosa v. Mass. Dep't of Corr.*, 654 F. Supp. 3d 33, 43 (D. Mass. 2023), "[t]he [Supreme Judicial Court] has noted . . . that 'a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights.'"  *Humphrey,* 2017 WL 1224539, at *8 n.6 (quoting *Layne v. Superintendent*, *Mass. Corr. Inst.,* 546 N.E.2d 166, 169 (Mass. 1989)).  In any event, because "[t]he protections of art. 16 of the Massachusetts Declaration of Rights are coextensive with those of the First Amendment," *Roach v. Green*, CIVIL ACTION NO. 14-13515-RGS, 2016 WL 1254236, at *2 n.4 (D. Mass. Mar. 29, 2016) (citing *Hosford v. Sch. Comm. of Sandwich*, 659 N.E.2d 1178, 1180 n.5 (Mass. 1996)), there is no need for a separate art. 16 analysis.

This court recommends that the referring court find that Plaintiff has stated a viable claim for First Amendment retaliation against the City and that Defendant's motion to dismiss Count VII be denied.

B.  State Law Claims Under the Massachusetts Tort Claims Act:
Counts I, II, and VIII

Defendant seeks dismissal of the state law claims, Count I (negligence), Count II (negligent infliction of emotional distress), and Count VII (wrongful death), based on Plaintiff's failure to make presentment within the Massachusetts Tort Claims Act's ("MTCA's") statutory deadline, *see* Mass. Gen. Laws ch. 258, § 4, and her failure to state plausible claims.[4]

    1.    The MTCA

"The [MTCA] makes public employers liable for loss of property, personal injury, or death caused by the negligence or wrongful conduct of public employees acting within the scope of their employment." *Drake v. Town of Leicester*, 140 N.E.3d 413, 416 (Mass. 2020) (citing Mass. Gen. Laws ch. 258, § 2). "A claimant cannot institute a civil action against a public employer for damages 'unless the claimant shall have first presented [her] claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose.'" *Id.* (alteration in original) (quoting Mass. Gen. Laws ch. 258, § 4). "Presentment is a condition precedent to [N.M.'s] negligence claims and must 'be made "in strict compliance with the statute."'" *Harrington*, 172 F. Supp. 3d at 347 (quoting *Gilmore v. Commonwealth*, 632 N.E.2d 838, 840 (Mass. 1994)). A plaintiff's status as a minor does not toll the MTCA's two-year presentment requirement. *See George*, 474 N.E.2d at 170, 172 ("[p]resentment is a statutory prerequisite" that "must be met regardless of the age of the claimant"); *see also Haley v. City of Boston*, 657 F.3d 39, 54 (1st Cir. 2011). "The presentment requirement serves an important purpose by providing notice of the claim and to allow the public employer to investigate and consider settlement." *Harrington,* 172 F. Supp. 3d at 347.

---

[4] Defendant has abandoned its contention that Plaintiff's negligence claims are time-barred, conceding that the statute of limitations was suspended during N.M.'s minority. *See George v. Town of Saugus,* 474 N.E.2d 169, 170 & n.2 (Mass. 1985) (quoting Mass. Gen. Laws ch. 260, § 7).

2.    Counts I and II:  Negligence and Negligent Infliction of Emotional
     Distress

Plaintiff brings negligence and negligent infliction of emotional distress claims against

Defendant for N.M.'s "personal injuries" and "emotional distress" allegedly caused by

Defendant's acts or omissions in failing to keep N.M. safe from bullying and harassment

(Compl. ¶¶ 98-108).  Plaintiff's presentment letter was delivered to Defendant on January 27,

2022 (Compl. ¶ 105; Dkt. No. 9 at 31-33).  "Liberally construing Plaintiff['s] allegations,"

*Harrington,* 172 F. Supp. 3d at 347, it appears that the last bullying incident occurred in or

around November 2019 (Compl. ¶ 84).  Because, as to Counts I and II, the presentment letter

should have been delivered by November 2021, the January 27, 2022 letter was untimely.

Plaintiff does not dispute this conclusion, contending instead that the Supreme Judicial

Court's ("SJC") Third Updated Order Regarding Court Operations Under the Exigent

Circumstances Created by the COVID-19 (Coronavirus) Pandemic ("COVID Order") tolled the

two-year presentment period under the MTCA (Dkt. No. 20 at 4-5).

> In the early months of the COVID-19 pandemic, pursuant to [the SJC's]
> "superintendence and rule making authority," G. L. c. 211, § 3, th[e] court issued
> a series of orders "with respect to court proceedings, new filings, and trials,
> designed to 'protect the public health by reducing the risk of exposure to the virus
> and slowing the spread of the disease.'"

*Graycor Constr. Co. v. Pac. Theatres Exhibition Corp.*, 193 N.E.3d 1083, 1089 (Mass. 2022)

(quoting *Comm. for Pub. Counsel Servs. v. Chief Justice of the Trial Court (No. 1)*, 142 N.E.3d

525, 529 (Mass. 2020)).  The SJC orders "provided guidance to lower courts as to how to

conduct court operations safely amid the ongoing public health crisis, so that the courts remained

accessible to the public, while abiding by public health restrictions to protect litigants, attorneys,

and court employees." *Id.* at 1092.  "[T]he topics they discussed were limited to court operations

under the exigent circumstances created by the COVID-19 pandemic, including electronic filing,

19

remote proceedings, and controlling physical access to court houses." *Dunn v. Langevin*, 211 N.E.3d 1059, 1063 (Mass. 2023).

As did the plaintiffs in the *Graycor* and *Dunn* cases, Plaintiff relies on the reference to statutory deadlines in the COVID Order to support her claim that the time for presentment under the MTCA was tolled.  The COVID Order, which was issued on June 24, 2020, stated, in pertinent part, that it applied to "all deadlines set forth in statutes or court rules, standing orders, tracking orders, or guidelines." *Graycor Constr. Co.,* 193 N.E.3d at 1090.  In *Graycor* and *Dunn*, the SJC held that, because its general superintendence power is limited to state court operations, the reference in the order to "all statutory deadlines" meant "only those statutory deadlines that pertained to cases pending in court or to be filed in court." *Graycor Constr. Co.,* 193 N.E.3d at 1086; *see Dunn*, 211 N.E. 3d at 1063-64.  In *Dunn,* the SJC held that, even though a prior filing with the Massachusetts Commission Against Discrimination ("MCAD") is a prerequisite for filing suit in court, that "is not enough to bring the MCAD filing deadline within the limited scope of [the SJC's] orders." *Dunn,* 211 N.E.3d at 1064.  Similarly, a timely presentment letter is a prerequisite for filing an MTCA claim in court.  *See* Mass. Gen Laws ch. 258, § 4.  Because the City is not part of the judicial branch of government that is subject to the SJC's authority, the court's COVID Order did not extend the time for filing the presentment letter under Mass. Gen. Laws ch. 258, § 4.  *See Dunn,* 211 N.E.3d at 1064.

Because Plaintiff did not timely present her claim to the City in advance of filing suit, I recommend that the negligence claims in Counts I and II be dismissed with prejudice.

        3.       Count VIII:   Wrongful Death

        a.       Presentment under the MTCA

Defendant has not, however, shown the same basis for dismissal of Plaintiff's wrongful death claim.  "[A] cause of action for wrongful death accrues at the time of death . . . ."  *Bellanti v. Boston Pub. Health Comm'n,* 874 N.E.2d 439, 443 n.5 (Mass. App. Ct. 2007) (citing *Fearon v. Commonwealth,* 474 N.E.2d 162, 164 (Mass. 1985)).  N.M. died on January 30, 2022 (Compl. ¶ 92).  Plaintiff presented her claim to the City by hand delivery on January 27, 2022, "within two years after the date upon which the cause of action arose [.]"  Mass. Gen. Laws ch. 258, § 4.

   b.  Plaintiff's Wrongful Death Claim

The Commonwealth's wrongful death statute provides in relevant part that "'[a] person who . . . by his negligence causes the death of a person, . . . shall be liable . . . .'"  *Williamson-Green v. Equip. 4 Rent, Inc.*, 46 N.E.3d 571, 575 n.8 (Mass. App. Ct. 2016) (quoting Mass. Gen. Laws ch. 229, §2).  "To prevail on a negligence claim under Massachusetts law, 'a plaintiff must show by a preponderance of the evidence [:] (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury.'"  *Leader v. Harvard Univ. Bd. of Overseers*, Civil Action No. 16-10254-DJC, 2017 WL 1064160, at *5 (D. Mass. Mar. 17, 2017) (alteration in original) (quoting *Heinrich v. Sweet*, 308 F.3d 48, 62-63 (1st Cir. 2002) (internal quotation marks and citation omitted)).  *See Jupin v. Kask,* 849 N.E.2d 829, 834-35 (Mass. 2006).  The City argues that it did not have a duty to protect N.M. from suicide, that even if it had such a duty, it did not cause N.M.'s death, and that, to the extent it was negligent, it is exempt from liability under Mass. Gen. Laws ch. 258, § 10(j) (Dkt. No. 17 at 19-30).  The court addresses these contentions in turn.

"Whether a duty of care exists is a question of law and an appropriate subject of a motion to dismiss pursuant to Rule 12(b)(6)."  *Leavitt v. Brockton Hosp., Inc.*, 907 N.E.2d 213, 215-16 (Mass. 2009) (citing *Jupin*, 849 N.E.2d at 835).  Defendant submits that there is no special

relationship between the High School and its students that gives rise to a duty of reasonable care and, even if there was, Defendant did not have a duty to prevent N.M.'s suicide (Dkt. No. 17 at 21-24).  Unsurprisingly, Plaintiff disagrees.  Both parties rely on *Nguyen v. Mass. Inst. of Tech.,* 96 N.E.3d 128 (Mass. 2018), in which the SJC held that, although there is no general duty to prevent a suicide, *see id.* at 139, a university has a special relationship with its students and a corresponding duty to take reasonable measures to prevent the student's suicide if the university has "actual knowledge of a student's suicide attempt that occurred while enrolled at the university or recently before matriculation, or of a student's stated plans or intentions to commit suicide . . . ."  *Id.* at 142-43.

In *Nguyen*, the SJC looked at "a number of factors used to delineate duties in tort law" to determine whether MIT had a duty to its students.  *Id.* at 142.  The court placed particular emphasis on the foreseeability of harm, and also considered the plaintiff's reasonable reliance on the defendant, the degree of certainty of harm, the burden on the defendant to take reasonable steps to prevent the injury, whether there was mutual dependence between the plaintiff and defendant, whether the defendant was blameworthy in failing to act, and the policy implications of placing an economic burden on the defendant.  *Id.*  Ultimately, the court concluded that, in limited circumstance, a university had a duty to prevent a student's suicide. *See id.* at 144.

The Massachusetts Appeals Court has indicated, albeit in dicta, that *Nguyen's* principles should apply to the suicide of a high school student.  *See Paradis v. Frost,* 218 N.E.3d 664, 673 (Mass. App. Ct. 2023).  In *Paradis,* the parent of a high school student who committed suicide during summer vacation brought negligence and wrongful death claims against the school district.  *See id.* at 668-69.  The school knew the student suffered from anxiety, attention deficit hyperactivity disorder, and impulsivity, had a friend who had died by suicide, had stopped doing

homework, and was failing his classes. *See id.* Relying on *Nguyen,* the plaintiff argued that "the school district owed a duty to take reasonable steps to prevent [the student's] suicide," and breached its duty when a school counselor failed to adequately care for the student after his girlfriend reported her concern that he would harm himself. *Id.* at 672. Although the court dismissed the case based on the school district's immunity from suit, the court found that the plaintiff's argument that the *Nguyen* principles should extend to public school districts "has some force . . . ." *Id.* at 673.

In this court's view, application of the SJC's *Nguyen* analysis, at the motion to dismiss stage, favors allowing the negligence claim to proceed on the theory that the High School had a special relationship with N.M. and a corresponding duty to take reasonable steps to prevent her suicide. *See Nguyen,* 96 N.E.3d at 140; *Sharon v. City of Newton,* 769 N.E.2d 738, 748 n.12 (Mass. 2002) (the SJC recognizes a "special relationship" between a public school and its students). There is no dispute that, like the university in *Nguyen,* a public high school is significantly involved in the lives of its students. In addition to providing an education, a high school provides a myriad of extracurricular activities and a community for its students. *See Nguyen,* 96 N.E.3d at 141-42. Both universities and public schools have responsibilities for the safety of their students. *See id.* at 140 (citing *Mullins v. Pine Manor Coll.,* 449 N.E.2d 331, 335 (Mass. 1983)); *Alter v. City of Newton,* 617 N.E.2d 656, 658 (Mass. App. Ct. 1993) ("Because of the relationship between a school and its students, the city had a duty of care to the plaintiff to provide her with reasonably safe school premises."); *see also* Mass. Gen. Laws ch. 71, § 37H (directing each school district to have "standards and procedures to assure school building security and safety of students and school personnel") and § 37O(b), (d)(1) (prohibiting bullying and requiring school districts to "develop, adhere to and update a plan to address bullying

23

prevention and intervention . . . .").  In contrast to university students who are "young adults,"
*Nguyen,* 96 N.E.3d at 141, high school students are generally minors who may be more
vulnerable to harm and require more protection than do university students (Compl. ¶ 2).  *See*
*Driscoll v. Trs. of Milton Acad.,* 873 N.E.2d 1177, 1193 (Mass. App. Ct. 2007) (Mills, J.,
concurring in part and dissenting in part) ("The existence of a duty that secondary schools owe to
minor children is further supported by the special protections that both the courts and the
Legislature have long accorded to minors, and by the doctrine of in loco parentis") (footnote
omitted).

        In this case, an analysis of the relevant factors supports the view that the High School's
special relationship with N.M. gave rise to a duty to take reasonable measures to protect her from
self-harm.  First, the "duty hinges on foreseeability."  *Nguyen,* 96 N.E.3d at 144.  According to
the complaint, the school's employees were aware that N.M. attempted suicide in May 2019
(Compl. ¶¶ 52-59) and, in September 2019, she made suicidal statements while she was in
Malvezzi's office (Compl. ¶¶ 72-74).  *See id.*  Second, the High School's anti-bullying and anti-
harassment policies and procedures, and the safety plan it put into effect for N.M. "'fostered'
expectations . . . that reasonable care [would] be exercised to protect [students] from harm."  *Id.*
(quoting *Mullins,* 449 N.E.2d at 336).  Third, school staff members knew that N.M. suffered
from anxiety and PTSD, was a target of bullying, and had been physically assaulted at least
twice, resulting in severe physical injuries.  There was a high probability of grave harm that
justifies the imposition of a duty on the school (Compl. ¶¶ 40, 51, 52, 64-68, 81-83).  *See id.*
Finally, "[m]oral blameworthiness on the part of a [high school] in failing to act to intervene to
save a young person's life, when it was within the [school's] knowledge and power to do so, is
understood and accepted by our society."  *Id.*  At least at this stage, Plaintiff has alleged

sufficient facts to support her claim that a special relationship existed between N.M. and the

High School giving rise to the school's duty to protect N.M. from the foreseeable risk of suicide.

Plaintiff also has to establish a causal connection between Defendant's alleged breach of

duty and N.M.'s suicide.  *See Leader*, 2017 WL 1064160, at *5.  "Causation has traditionally

involved two separate components: the defendant had to be both a factual cause (or 'cause in

fact') and a legal cause of the harm."  *Doull v. Foster*, 163 N.E.3d 976, 982–83 (Mass. 2021).

*See Leavitt*, 907 N.E.2d at 219. "Generally, a defendant is a factual cause of a harm if the harm

would not have occurred "but for" the defendant's negligent conduct."  *Doull*, 163 N.E.3d at 983.

"Legal causation is also commonly referred to as 'proximate causation.'"  *Id.*  "[N]egligent

conduct is the proximate cause of an injury . . . [if] the injury to the plaintiff was a foreseeable

result of the defendant's negligent conduct."  *Kent v. Commonwealth,* 771 N.E.2d 770, 777

(Mass. 2002).  *See Heng Or v. Edwards,* 818 N.E.2d 163, 171 (Mass. App. Ct. 2004).

> The word "foreseeable" has been used to define both the limits of a duty of care
> and the limits of proximate cause.  As a practical matter, in deciding the
> foreseeability question, it seems not important whether one defines a duty as
> limited to guarding against reasonably foreseeable risks of harm or whether one
> defines the necessary causal connection between a breach of duty and some harm
> as one in which the harm was a reasonably foreseeable consequence of the breach
> of a duty.

*Whittaker v. Saraceno*, 635 N.E.2d 1185, 1187- 88 (Mass. 1994) (citation omitted).  "'The

question whether the risk of injury was foreseeable is almost always one of fact.'"  *Cole v. City

of New Bedford,* Civil Action No. 15-10955-LTS, 2015 WL 3953230, at *3 (D. Mass. June 26,

2015) (quoting *Christopher v. Father's Hurdle Café, Inc.,* 782 N.E.2d 517, 526 (Mass. App. Ct.

2003) (citation omitted)).

Defendant maintains that Plaintiff's claims of causation are speculative and insufficient

to state a viable claim (Dkt. No. 17 at 19-21).  However, in addition to the allegations in the

complaint concerning N.M.'s prior suicide attempt and statements, other allegations contribute to raise a reasonable inference that school employees' negligence caused N.M.'s death (Dkt. No. 20 at 14). The complaint alleges that Malvezzi and Leydon were aware that high school students began bullying and harassing N.M. during the summer of 2018 and that they continued to bully, harass, and threaten N.M. when she attended the High School until she withdrew after November 19, 2019 (Compl. ¶¶ 23-35, 40-43, 47, 61, 71, 72, 76, 81, 84, 89). Despite N.M.'s May 2019 suicide attempt, Defendant placed her in The Academy, a behavioral program for physically aggressive students where she was severely beaten (Compl. ¶¶ 52, 62-64). The safety plan, which was supposed to ensure that a staff member would supervise N.M. throughout the school day, did not stop the bullying, harassment, and physical assaults and N.M.'s feelings of isolation, fear, anxiety, and depression increased (Compl. ¶¶ 68, 71, 72, 74, 76, 81-84). The school's failure and refusal to protect N.M. caused Plaintiff to withdraw her from the High School in November 2019 (Compl. ¶¶ 84, 89). According to the complaint, N.M. repeatedly identified the school's inability to keep her safe as a reason for her suicidal ideation (Compl. ¶¶ 52, 89-92). Viewing the complaint's allegations in the light most favorable to Plaintiff, she has plausibly alleged that the City's negligence was the proximate cause of N.M.'s death.

        c.      Immunity from suit and liability under Mass. Gen. Laws ch. 258

Defendant contends that it is immune from suit and liability under Mass. Gen. Laws ch. 258, § 10(j) (Dkt. No. 17 at 24-30). Plaintiff responds that § 10(j) does not apply because her injuries were originally caused by a public employee, *see* Mass. Gen. Laws ch. 258, § 10(j), and, even if they were not, her claims are based on Defendant's "explicit and specific assurance of safety or assistance," *see* Mass. Gen. Laws ch. 258, § 10(j)(1) (Dkt. No. 20 at 17-20).

        Immunity under Mass. Gen. Laws ch. 258, § 10(j)

Although Mass. Gen. Laws ch. 258 "statutorily eliminates the immunity that governmental bodies would ordinarily enjoy under common law, it sets forth several exceptions to that general waiver of sovereign immunity" in § 10 (a)–(j). *Cormier v. City of Lynn*, 91 N.E.3d 662, 665 (Mass. 2018). Section 10(j) bars "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Mass. Gen. Laws ch. 258, § 10(j).

> In other words, § 10(j), which "was intended to provide some substantial measure of immunity from tort liability" to public employers, eliminates government liability for a public employer's act or failure to act to prevent harm from the wrongful conduct of a third party *unless* the condition or situation was "*originally caused*" by the public employer.

*Cormier,* 91 N.E.3d at 666 (footnote omitted) (quoting *Brum v. Town of Dartmouth*, 704 N.E.2d 1147, 1153-54 (Mass. 1999)). A public employer will be found to have "originally caused" a condition or situation if: (1) the employer took "an affirmative action" (a failure to act is insufficient); and (2) the affirmative action "'materially contributed to creating the specific 'condition or situation' that resulted in the harm.'" *Id.* (citation omitted).

Even accepting Plaintiff's allegation that the City's "affirmative decision to have a policy of intentionally misclassifying bullying [as peer-on-peer conflict] . . . encouraged and enabled N.M.'s tormentors to continue bullying and harassing her" (Dkt. No. 20 at 19), the complaint fails to show that Defendant's affirmative acts "materially contributed to creating [the specific] condition or situation that resulted in [N.M.'s death]." *Cormier,* 91 N.E.3d at 667. *See Town of N. Andover*, 2023 WL 3481494, at *18 ("For § 10(j) to not apply, 'the claim must involve "*something more* than the pure failure to alleviate a private harm" and that to be successful a claimant must show "*some* involvement of a public employee in creating the injury-causing

scenario, not simply a failure to respond adequately after it arises."'") (quoting *Armstrong v. Lamy*, 938 F. Supp. 1018, 1043 (D. Mass. 1996)).  When analyzing immunity under § 10(j) in suicide cases, the Massachusetts Appeals Court has rejected contentions similar to Plaintiff's claim that the school's failure to protect N.M. was the original cause of her suicide.  The court has found that suicide was the result of the decedent's "own state of mind," not the public employees' acts.  *Paradis,* 218 N.E.3d at 670.  *See McCarthy v. City of Waltham,* 924 N.E.2d 316, 322 (Mass. App. Ct. 2010) (city was immune from suit where the original cause of the decedent's suicide, an hour after being released from custody, was his "suicidal frame of mind").  This is not a case in which the City's employees are alleged to have actively participated in harassment or bullying that led up to N.M.'s death.

Mass. Gen. Laws ch. 258, § 10(j)(1) Exception

Plaintiff nonetheless argues that, even if the general immunity principle in § 10(j) applies, she is entitled to invoke the exception in Mass. Gen. Laws ch. 258, § 10(j)(1) (Dkt. No. 20 at 19-20).  General Laws c. 258, § 10 (j)(1), provides, in pertinent part, that immunity does not apply to:

> any claim based upon explicit and specific assurances of safety or assistance,
> beyond general representations that investigation or assistance will be or has been
> undertaken, made to the direct victim or a member of her family or household by
> a public employee, provided that the injury resulted in part from reliance on those
> assurances.

Mass. Gen. Laws ch. 258, § 10(j)(1).  "'This section only applies 'to the truly exceptional case where direct and explicit assurances are given to a particular person quite apart from the normal carrying out of officials' routine duties.'"  *Paradis,* 218 N.E.3d at 671 (quoting *Barnes v. Metro. Hous. Assistance Program,* 679 N.E.2d 545, 550 (Mass. 1997)).  "The phrase 'explicit and specific assurances' requires 'a spoken or written assurance, not one implied from the conduct of

28

the parties or the situation,' and the 'terms of the assurance must be definite, fixed, and free from ambiguity.'" *McCarthy,* 924 N.E.2d at 322 (quoting *Ariel v. Kingston,* 867 N.E.2d 367, 370 (Mass. App. Ct. 2007)). *See Lawrence v. Cambridge,* 664 N.E.2d 1, 3 & n.5 (Mass. 1996).

      Fairly read, Plaintiff adequately pleads that her claim falls under the statutory exception. She alleges that in implementing the safety plan, the City's employees made an explicit and specific assurance, in writing, to her and N.M. that the school would provide adult supervision for N.M. at all times during the school day to protect N.M. from physical and emotional harm (Compl. ¶¶ 68, 69). *See Doe v. Dennis-Yarmouth Reg'l Sch. Dist.,* 578 F. Supp. 3d 164, 174 (D. Mass. 2022) (a written IEP, which provided that the student would not be alone at any time during the entire school day, was explicit and specific); *Town of Chelmsford,* 267 F. Supp. 3d at 313 (a superintendent's statement that "[w]e have teachers in the hallways that monitor things and he will be fine" was an explicit and specific assurance of safety under § 10(j)(1)). Plaintiff further alleges that she relied on the specific assurances of safety when she permitted N.M. to return to the High School after September 10, 2019 (Compl. ¶ 70). Plaintiff alleges that, when N.M. returned, the bullying, harassment, threats, and physical assaults continued, N.M.'s mental health declined, and she committed suicide because the school would not keep her safe (Compl. ¶¶ 71-74, 76, 81-84, 89-92).[5] These allegations are sufficient to invoke the 10(j)(1) exception.

---

[5] The city did not invoke the discretionary function exception in Mass. Gen. Laws ch. 258, § 10(b) until it filed its reply to Plaintiff's supplemental opposition to Defendant's motion to dismiss and it did so only in passing (Dkt. No. 35 at 3 & n.4). Section 10(b) does not apply because the decisions at issue here did not "involve social, political, or economic policy considerations . . . ." *Alake v. City of Boston,* 666 N.E.2d 1022, 1025 (Mass. App. Ct. 1996). The student supervision cases on which the City relies were overruled by the SJC's decision in *Harry Stoller & Co. v. Lowell,* 587 N.E. 780, 784 n.2 (Mass. 1992) (Dkt. No. 35 at 3 n.4). *See Alake,* 666 N.E.2d at 1025 n.7 (Mass. App. Ct. 1996).

For the reasons stated above, the court recommends that Defendant's motion to dismiss the wrongful death claim (Count VIII) be denied.

V.    CONCLUSION

For the foregoing reasons, I recommend that the court dismiss Plaintiff's claims in Counts I, II, III, and IX with prejudice, deny dismissal as to Counts V, VII, and VIII, and dismiss only so much of Count VI as asserts a claim for emotional distress damages.[6]

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  April 15, 2024

---

[6] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.