UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br><br>        Plaintiff,<br><br>        v.<br><br>CITY OF NORTHAMPTON,<br><br>        Defendant. | Civil Action No. 23-10358-MGM |

MEMORANDUM AND ORDER RE: REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
(Dkt. Nos. 16 and 38)

JULY 1, 2024

MASTROIANNI, U.S.D.J.

## I.  INTRODUCTION

This action arises out of the tragic suicide of Jane Doe's ("Plaintiff") sixteen-year-old daughter,

N.M., on January 30, 2020. As a result of her daughter's passing, Plaintiff initiated this action against

the City of Northampton ("Defendant"), alleging negligence (Count I), negligent infliction of

emotional distress (Count II), intentional infliction of emotional distress (Count III), violation of 42

U.S.C. § 1983 (Count V),[1] violation of Title VI of the Civil Rights Act of 1964 (Count VI), retaliation

for conduct protected by the First Amendment to the United States Constitution and Article 16 of

the Massachusetts Declaration of Rights (Count VII), wrongful death (Count VIII), and punitive

damages (Count IX). In response, Defendant moved to dismiss the complaint in its entirety for failing

to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

This court subsequently referred the motion to dismiss to United States Magistrate Judge Katherine

---

[1] The complaint does not include a Count IV.

A. Robertson for a report and recommendation.

On April 15, 2024, Judge Robertson issued a Report and Recommendation (Dkt. No. 38) recommending this court grant Defendant's motion to dismiss in part and deny the motion to dismiss in part. Specifically, Judge Robertson recommended dismissal with prejudice of Count I (negligence), Count II (negligent infliction of emotional distress), Count III (intentional infliction of emotional distress), and Count IX (punitive damages). In addition, Judge Robertson recommended partial dismissal of Count VI (violation of Title VI), to the extent Count VI sought emotional distress damages. As to Count V (violation of 42 U.S.C. § 1983), the remainder of Count VI, Count VII (retaliation for conduct protected by the First Amendment), and Count VIII (wrongful death), Judge Robertson recommended denial of Defendant's motion.[2]

On April 26, 2024, pursuant to Fed. R. Civ. P. 72(b), Defendant filed a partial objection to Judge Robertson's Report and Recommendation. (Dkt. No. 39.) According to Defendant, the Report and Recommendation erred in refusing to grant Defendant's motion in full. As to Counts V and VII, Defendant contends Plaintiff failed to adequately plead the existence of an unconstitutional municipal custom or policy, as required by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) to bring a Section 1983 claim against a municipality. As to Count VI, Defendant argues Plaintiff failed to adequately plead the existence of severe and pervasive racial discrimination, as required to bring a claim pursuant to Title VI of the Civil Rights Act of 1964. Finally, as to Count VIII, Defendant raises the following objections: (i) Plaintiff failed to timely present her claim to the City of Northampton, as required by the Massachusetts Tort Claims Act (the "MTCA"), rendering the claim time barred; (ii) Massachusetts law does not recognize a duty of care between a student and a high school, as required to hold Defendant liable for a wrongful death claim sounding in negligence; and (iii) Defendant is

---

[2] The court adopts the Report and Recommendation's recitation of the factual allegations in Plaintiff's complaint.

immune from liability pursuant to the MTCA. In response, Plaintiff argues Judge Robertson's analysis with respect to each of these issues was correct.

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 72(b)(3), this court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." *See also* 28 U.S.C. § 636(b)(1). "Absent objection … [a] district court has a right to assume that [the affected party] agree[s] to the magistrate's recommendation." *M. v. Falmouth Sch. Dep't*, 847 F.3d 19, 25 (1st Cir. 2017) (quoting *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985), *cert. denied*, 474 U.S. 1021 (1985)) (alteration in original). After conducting this *de novo* review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

As this Report and Recommendation comes before the court on Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Therefore, the complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating whether dismissal is appropriate under Rule 12(b)(6), the court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the plaintiff's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013); *see also Ocasio-Hernandez v. Fortuno-Burset,* 640 F.3d 1, 11 (1st Cir. 2011) (explaining "that evaluating the plausibility of a legal claim is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.,* 886 F.3d

43, 48 (1st Cir. 2018) (internal quotation omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Pitta v. Medeiros*, 90 F.4th 11, 17 (1st Cir. 2024). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (citing *Twombly*, 550 U.S. at 555). Generally, the court's review is limited to allegations in the complaint, but it "may [also] consider 'implications from documents attached to or fairly incorporated into the complaint,'" *Barchok*, 886 F.3d at 48 (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2005)) (alteration added), as well as "matters of public record, and other matter susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (quoting *In re Colonial Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)).

### III.   DISCUSSION

After *de novo* review and noting that no party objected to this portion of the Report and Recommendation, the court adopts the thorough and well-reasoned opinion of Judge Robertson with respect to Counts I, II, III, and IX. These claims are therefore dismissed with prejudice. In addition, the court adopts Judge Roberston's analysis with respect to Count VI. To the extent this count seeks emotional distress damages, that request is dismissed with prejudice.[3] Finally, for the following reasons, the court adopts Judge Robertson's recommendation with respect to Counts V, the remainder

---

[3] In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, *reh'g denied*, 142 S. Ct. 2853 (2022), the Supreme Court held emotional distress damages are not available under Spending Clause statutes such as Title VI. *See id.* at 220-230; *see also Barnes v. Gorman,* 536 U.S. 181, 187-90 (2002) (explaining punitive damages are also unavailable under the Spending Clause statutes). In light of these rulings, Plaintiff may have difficulty in demonstrating damages corresponding to her Title VI claim. But the court agrees with Judge Robertson that the damages question cannot be resolved at this early stage of litigation.

of Count VI (not concerning emotional distress damages), VII, and VIII. Consequently, the motion to dismiss these counts is denied.

### A.    Count V

As to Count V, the court agrees with the Report and Recommendation's findings that Plaintiff adequately pled the existence of an unconstitutional policy or custom for purposes of *Monell* liability. Under *Monell*, a plaintiff must generally demonstrate an "affirmative policy decision" which was authorized by the individual or entity endowed with legal authority to set "official municipal policy." *See Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 305-06 (D. Mass. 2017) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) for the first proposition, and quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) for the second proposition). In Massachusetts, "the school committee in each city or town has policymaking authority." *Id.* at 306; *see also* Mass. Gen. Law ch. 71, § 37. As pled, Plaintiff does not allege any affirmative act by the Northampton School Committee adopting the allegedly unconstitutional policy. But, consistent with *Monell* and the text of Section 1983, a "plaintiff … may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state 'custom or usage.'" *Pembaur*, 475 U.S. at 481 n. 10. When pressing a Section 1983 claim sounding in custom or usage, a plaintiff must show (1) the custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice"; and (2) "the custom must have been the cause of and the moving force behind the constitutional violation." *Thomas*, 267 F. Supp.3d at 306 (quoting *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005)).

Here, Plaintiff alleges Defendant had "an unwritten policy to intentionally downgrade and misclassify bullying incidents as incidents of 'peer on peer conflict.'" (Dkt. No. 1-2, ¶ 93.) In addition to alleging an articulable policy or custom, the complaint contains factual allegations which plausibly

support two inferences necessary to sustain this claim: (1) the policy or custom of intentionally misclassifying bullying incidents was so well settled and widespread that policymakers had actual or constructive awareness; and (2) the policy or custom of misclassifying bullying led to N.M.'s death by subjecting her to relentless physical and emotional harm during school hours, thereby damaging N.M. psychologically to the point she took her own life. Specifically, Plaintiff alleges as follows: (i) multiple officials at NHS were aware of bullying directed toward N.M. before her enrollment at NHS (Dkt. No. 1-2, ¶¶ 24-26); (ii) multiple NHS officials were aware of bullying that occurred throughout the course of N.M.'s freshman year yet they did nothing to stop the harassment (*id.* ¶¶ 34-41); (iii) this pattern of bullying was both violent and racialized in nature (*id.* ¶¶ 29, 31-33, 64, 76, 81); (iv) an NHS guidance counselor was photographed with one of N.M.'s bullies, who then sent N.M. the photograph with a caption implying school staff "hate[d] her guts too," with the school taking no action to address the situation when made aware of the photograph (*id.* ¶¶ 42-43); (v) NHS was aware of N.M.'s first suicide attempt caused by her harassment at school, yet this suicide attempt did not alter Defendant's misclassification of N.M.'s school related issues (*id.* ¶ 52); (vi) following N.M.'s first suicide attempt, an NHS guidance counselor, relying on Defendant's allegedly unconstitutional policy or custom, knowingly misstated the true nature of N.M.'s school related issues by informing the Department of Child and Family Services ("DCF") they were the result of "peer on peer conflict" (*id.* ¶¶ 53-54, 59); (vii) NHS suspended N.M. multiple times after she was assaulted, thereby plausibly implying an attempt to misclassify N.M.'s bullying by portraying her as the aggressor (*id.* ¶¶ 75, 79, 85-86); (viii) despite knowing N.M. had been repeatedly assaulted and attempted suicide, NHS officials transferred N.M. to the "Academy Program" for students with aggression related issues, where she was severely beaten (*id.* ¶¶ 62-65); and (ix) NHS officials failed to adequately implement N.M.'s Safety and

Supervision Plan rendering the school environment so unsafe that N.M. could no longer attend,[4] which ultimately led to her suicide (*id.* ¶¶ 68, 75, 77, 79, 81, 84-89, 92). When viewed in isolation, each of these allegations might not support a plausible inference that an unconstitutional policy or custom was in force, but "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Kenn v. Eascare, LLC*, 483 F. Supp. 3d 26, 31 (D. Mass. 2020) (quoting *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013)). However, when viewed in their entirety, these factual allegations support the plausible existence of the unconstitutional policy articulated by Plaintiff.

Finally, Defendant's attempt to distinguish the three cases principally relied upon by Judge Robertson—*Doe v. Town of Wayland*, 179 F. Supp.3d 155 (D. Mass. 2016), *Off. of Pub. Guardian v. Elliot Hosp.*, 626 F. Supp.3d 520 (D.N.H. 2022), and *Lewis v. Blue Springs Sch. Dist.*, No. 4:17-CV-00538-NKL, 2017 WL 5011893 (W.D. Mo. Nov. 2, 2017)—is not persuasive. Contrary to Defendant's contention, these cases stand for the legal proposition that a "systemic pattern of activity [even though targeted at one plaintiff can] compel[] the Court to find [Plaintiff's] allegations 'more akin to the serial misconduct

---

[4] According to Massachusetts law, "[e]very child between the minimum and maximum ages established for school attendance by the board of education shall, subject to section fifteen, attend a public day school in the town the student reside." Mass. Gen. Law ch. 76, § 1. In enacting this provision, the Massachusetts General Court established a system of compulsory education. *See Bd. of Educ. v. Sch. Comm. of Quincy,* 612 N.E.2d 666, 669 (Mass. 1993). In *Care & Protection of Charles*, 504 N.E.2d 592 (Mass. 1987)*,* the SJC affirmed that a child may only withdraw from the compulsory scheme embodied in Chapter 76 if the superintendent or school committee of the child's town is satisfied that the child is entering an alternative schooling arrangement meeting "certain reasonable educational requirements similar to those required for public and private schools." *Id.* at 600; *see also Goodall v. Worcester Sch. Comm.*, 405 F. Supp. 3d 253, 269-70 (D. Mass. 2019) ("[A] child cannot be withdrawn from school until *after* the school committee and/or superintendent has had an opportunity to review a proposed homeschooling plan *and* either approved or rejected it." (emphasis in original)). Plaintiff's complaint states that she "pulled N.M. out of Northampton High School because the School could not keep N.M. safe despite its specific assurance of safety on September 10, 2019." (Dkt. No. 1-2, ¶ 89.) But the complaint does not explain the alternate schooling arrangements (if any) made for N.M. At this point in the litigation, the court cannot construe this act as severing Defendant's legal obligation to provide N.M. with access to public schooling. Consequently, the court rejects Defendant's arguments for dismissal to the extent they are premised on N.M.'s failure to attend school after November 2019.

cases than to cases implicating the single incident rule.'" *Town of Wayland*, 179 F. Supp. 3d at 173 (quoting *Baron v. Suffolk Cnty. Sheriff's Dep't*, 402 F.3d 225, 239 (1st Cir. 2005)) (alteration added); *see also Elliot Hospital*, 626 F. Supp.3d at 531-32; *Lewis*, 2017 WL 5011893, at *12. Here, the nature of the allegations is akin to an ongoing and systemic pattern of misconduct indicative of a violation of the federal constitution, as opposed to a one-off incident not implicating the federal constitution. In a final objection to Judge Robertson's reliance on *Town of Wayland*, *Elliot Hospital*, and *Lewis*, Defendant claims these cases all "alleged truly systemic issues," in apparent contrast to the issues alleged by Plaintiff.[5] At the motion to dismiss posture, this interpretation of the allegations in favor of Defendant is not justified because the allegations must be "viewed in the light most favorable to the plaintiff." *Small Just. LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 321 (1st Cir. 2017) (internal quotation marks omitted). And, when viewed in this context, Defendant's alleged policy of misclassifying multiple incidents of bullying for more than a year, leading to the death by suicide of a sixteen-year-old girl, qualifies as a truly systemic issue bringing this case in line with *Town of Wayland*, *Elliot Hospital*, and *Lewis*. Accordingly, Judge Robertson's recommendation to deny the motion to dismiss Count V is adopted.[6]

---

[5] In addition, Defendant argues Plaintiff's claim is foreclosed by *Abdisamad v. City of Lewiston*, 960 F.3d 56 (1st Cir. 2020). The court agrees with Judge Robertson; *Abdisamad* does not alter this court's analysis. In *Abdisamad*, the First Circuit noted the plaintiff's complaint was "unusually spartan," relying on defendant's "failure ... to follow their protocols" as a basis for *Monell* liability. *Id.* at 57, 61. By contrast, here, Plaintiff's allegations are not only that Defendant failed to follow their policies and protocols, but also that Defendant adopted an unwritten alternate policy or custom which directly undercut the written policy thereby leading to N.M.'s death. These allegations, as supplemented by numerous specific factual assertions, differentiate this case from *Abdisamad*.

[6] As Judge Robertson noted, the viability of Plaintiff's *Monell* claim presents a close call. However, when a motion to dismiss presents a close call, courts in this district err on the side of allowing the plaintiff to proceed. *See, e.g., City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*, No. 22-CV-10321-ADB, 2024 WL 1258149, at *14 (D. Mass. Mar. 25, 2024) (denying motion to dismiss despite the claim presenting a "close call [which] would be scrutinized closely for purposes of any summary judgment motion") (alteration added)); *Jiang v. Tokyo II Steak House, Inc.*, 616 F. Supp. 3d 167, 180 (D. Mass. 2022) (denying a Rule 12(b)(6) motion when confronted by a "close call" as the legal

### B.    Count VI

As to Count VI, alleging Defendant violated Title VI of the Civil Rights Act of 1964, the court agrees with Judge Robertson that Plaintiff has adequately alleged the existence of severe and pervasive racial harassment targeted at N.M. In support of this claim, Plaintiff's complaint identifies two specific examples of racial harassment. First, an NHS student identified as A.M. told N.M. she was not "black enough" to wear her hair in braids. (Dkt. No. 1-2, ¶ 31.) Second, NHS assistant principal Celeste Malvezzi informed N.M. that when she wore "flashy eyelashes," it appeared N.M. was more likely to be targeted for harassment. Malvezzi then allegedly said, "but I know [the eyelashes] are cultural for you." (*Id.* ¶ 87.)  The court agrees with Judge Robertson; these comments are plausibly construed as racial in nature. *See, e.g., Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415 (5th Cir. 2015) (noting a comment about "ethnic hair styles" was "clearly indicative of racial animus"); *M.R. v. Burlington Area Sch. Dist.,* No. 21-CV-1284-JPS, 2023 WL 3510642, at *16 (E.D. Wis. May 17, 2023) (construing comments about plaintiff's hair as racial in nature). Moreover, Malvezzi's awareness that N.M. was targeted for harassment because of an element of her personal appearance deemed "cultural" supports a plausible inference that it was well known to faculty, staff, and students that N.M.'s bullying was

---

issue could not be resolved without a proper factual record); *WNAC, LLC v. Verizon Corp. Servs. Grp., Inc.*, No. 21-CV-10750-ADB, 2022 WL 17752132, at *9 (D. Mass. Dec. 19, 2022) (same); *United States v. Aegerion Pharms., Inc.*, No. 13-CV-11785-IT, 2019 WL 1437914, at *12 (D. Mass. Mar. 31, 2019) ("Although a close call, the Second Amended Complaint has alleged enough to survive a motion to dismiss."). "[T]he requirement of plausibility on a motion to dismiss under Rule 12(b)(6) 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct].'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17(1st Cir. 2011) (quoting *Twombly*, 550 U.S. at 556); *see also Cardigan Mountain Sch. v. New Hampshire Ins. Co.,* 787 F.3d 82, 88 (1st Cir. 2015). Here, "judicial experience and common sense," *Ocasio-Hernandez*, 640 F.3d at 16, informs the court's conclusion that the very nature of Plaintiff's *Monell* claim—involving closely protected juvenile records which are necessarily beyond the reach of any pre-suit investigation— informs the court's decision to allow the claim to proceed based on allegations Judge Robertson aptly characterized as "thin." *Cf. Sellers v. Trustees of Boston College*, 647 F.Supp.3d 14, 27 (D. Mass. 2022) ("While a close call …, [plaintiffs] have plead enough factual allegations based on the information available to them to state a plausible claim worthy of further investigation." (alteration added)). Ultimately, "[w]hether the evidence will support plaintiff's claims is a question for another day." *Jiang*, 616 F.Supp.3d at 180.

driven, at least in part, by race-based animus.  While Defendant objects that two specific instances of racially charged conduct do not constitute severe or pervasive race-based harassment, at this early point in the litigation the court considers it a plausible inference that a significant portion of the other alleged bullying (which was severe, pervasive, and offensive) was motivated by race. Furthermore, as Rule 12(b)(6) requires the court to conduct a "context-specific inquiry," the court agrees with Judge Robertson that it is relevant N.M. is not available to clarify the degree to which her bullying and harassment were motivated by racial animus. *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). In this case, the combination of two specific racially charged references and a litany of other well pled allegations in the complaint regarding severe and pervasive bullying (which may or may not prove to have been motivated by race) is sufficient to demonstrate that Plaintiff's Title VI claim is more than a "rote recital of the elements of a cause of action." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). Therefore, Defendant's objection "test[s] the complaint in a crucible hotter than the plausibility standard demands," *id.*, as "there is no absolute numerical standard by which to determine whether harassment has created a hostile environment," *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 16 (1st Cir. 1999) (internal quotation marks omitted). Accordingly, the court adopts Judge Robertson's recommendation that the motion to dismiss Count VI be denied.

### C.     Count VII

As to Count VII, alleging retaliation for an activity protected by the First Amendment, the court agrees with the Report and Recommendation's conclusion that Plaintiff has adequately alleged a claim. In the context of a First Amendment retaliation claim brought against a municipality, a plaintiff must satisfy the prerequisites for *Monell* liability discussed in greater detail above. As the court concludes Plaintiff adequately alleges the existence of a custom or policy of misclassifying bullying incidents, the central remaining inquiry is whether this custom or policy was the "moving force" behind Defendant's alleged retaliatory conduct. *See Thomas*, 267 F. Supp.3d at 306. Here, Plaintiff

contends N.M. was suspended multiple times in retaliation for reporting incidents of bullying. (Dkt. No. 1-2, ¶¶ 75, 79, 86.) The court finds it plausible that the moving force behind these suspensions was Defendant's custom or policy of misclassifying incidents of bullying. In other words, if Defendant had not adopted this custom or policy, N.M. would have been treated as a victim of bullying and consequently would not have been suspended for incidents in which she was not the aggressor. At this stage in the litigation, these allegations are sufficient to allege retaliation for exercise of N.M.'s First Amendment right to report her bullying. Accordingly, Judge Robertson's recommendation to deny the motion to dismiss Count VII is adopted.

### D.      Count VIII

Finally, as to Count VIII, alleging wrongful death sounding in Massachusetts law, the court does not find Defendant's first objection (failure to present) persuasive, nor does the court agree with Defendant's third objection (no waiver of sovereign immunity). In response to Defendant's second objection (no recognized duty of care), the court concludes Massachusetts law recognizes a duty of care between a public school and a student at foreseeable risk of suicide. Consequently, Judge Robertson's recommendation to deny the motion to dismiss Count VIII is adopted.

#### 1.   Presentment

As to the first objection, Defendant contends that Plaintiff failed to satisfy the presentment requirement set forth in Mass. Gen. Law ch. 258, § 4. Under this provision of the MTCA, "[a] civil action shall not be instituted against a public employer… [unless the claim was presented to the relevant government agency] within two years after the date upon which the cause of action arose." *Id.* (alteration added). In Massachusetts, "a cause of action for wrongful death accrues at the time of death and not at the time of injury." *Bellanti v. Bos. Pub. Health Comm'n*, 874 N.E.2d 439, 443 n. 5 (Mass. App. Ct. 2007). Here, N.M. passed away on January 30, 2020, making Plaintiff's presentment letter due by January 30, 2022. As the complaint indicates, Plaintiff presented her claim by hand delivery on

January 27, 2022, rendering the presentment timely. In response, Defendant argues Judge Robertson failed to consider the impact of two recent Massachusetts Supreme Judicial Court ("SJC") cases—*GGNSC Admin. Servs., LLC v. Schrader*, 140 N.E.3d 397 (Mass. 2020), and *Fabiano v. Philip Morris USA Inc.*, 211 N.E.3d 1048 (Mass. 2023)—on the MTCA presentment requirement's application to wrongful death claims. In these cases, the SJC clarified that "wrongful death actions [are] derivative of the decedent's action." *GGNSC Admin. Servs.*, 140 N.E.3d at 400 (alteration added). Thus, "[w]here a decedent could not maintain a personal injury action at the time of death [because of the statute of limitations], the representative of the decedent's estate has no right to bring an action for wrongful death for the benefit of the beneficiaries." *Fabiano*, 211 N.E.2d at 1052 (alteration added). Conversely, "where a decedent has such a right at the time of death, a cause of action for wrongful death vests in the personal representative of the decedent's estate, and the three-year statute of limitations for the wrongful death action begins to run from the date of death." *Id.* at 1051-52. Contrary to Defendant's objection, the SJC's analysis in *GGNSC Admin. Servs.* and *Fabiano* does not support Defendant's assertion that the estate also inherited N.M.'s presentment clock because, as the *Fabiano* court explained, the focus is whether the "decedent has such a right at the time of death." *Id.* at 1052. In contrast to the claims of the plaintiffs in *GGNSC Admin. Servs.* and *Fabiano*, N.M.'s claim was still timely when she died on January 30, 2020. N.M.'s claim was not yet foreclosed by either the statute of limitations or the MTCA presentment requirement. Thus, Plaintiff's derivative cause of action for wrongful death arose upon N.M.'s tragic death,[7] triggering a new statute of limitations and a new

---

[7] At the June 21, 2024 hearing, Defendant suggested that *GGNSC Admin. Servs.* and *Fabiano* overruled the Massachusetts Appeals Court's decision in *Bellanti v. Bos. Pub. Health Comm'n*, 874 N.E.2d 439 (Mass. App. Ct. 2007) *sub silentio*. The court does not agree for three reasons. First, in *Bellanti*, the decedent suffered an injury on March 25, 2003, died on May 4, 2003, and his estate commenced an action on September 13, 2005. Thus, unlike the decedents in *GGNSC Admin. Servs.* and *Fabiano*, the *Bellanti* decedent could have brought an action on the day he died as it was within the three-year statute of limitations governing negligence claims. *See* Mass. Gen. Law ch. 260, § 2A. Therefore, *GGNSC Admin. Servs.* and *Fabiano* do not alter (or even control) *Bellanti*'s resolution. Second, in *Fearon v.*

deadline for meeting the MTCA's presentment requirement. Consequently, the court adopts Judge

Robertson's conclusion that Plaintiff's claim was timely presented.

  2.  *Sovereign Immunity*

  As to Defendant's next threshold objection regarding sovereign immunity, the court concludes

that, unless an exception applies, Defendant would be immune from suit pursuant to Mass. Gen. Law

ch. 258, § 10(j).[8] However, the exception to immunity contained in Section 10(j)(1) does apply,

---

*Commonwealth*, 474 N.E.2d 162 (Mass. 1985), the SJC expressly observed, "[t]he plaintiff concedes that
he made no presentment of his claim to the appropriate executive officer within two years of his
decedent's death, the date on which the cause of action arose," indicating the SJC's understanding of
the interaction between the MTCA's presentment requirement and the wrongful death statute is in
accord with this court's understanding of the provisions. *Id.* at 164; *see also Weaver v. Commonwealth,* 438
N.E.2d 831, 833-34 (Mass. 1982) (noting the presentment requirement for a wrongful death claim
arises on the date of decedent's suicide). The court does not read *GGNSC Admin. Servs.* and *Fabiano*
as overruling any portion of these decisions. Finally, the reading of *GGNSC Admin. Servs.* and *Fabiano*
advocated by Defendant would render the separate three-year statute of limitation for wrongful death
claims found in Mass. Gen. Law ch. 229, § 2 meaningless, as the estate's statute of limitation would
be guaranteed to run at the same time as the decedent's statute of limitation (*i.e.*, on the date of
decedent's injury). But, in *Fabiano* the SJC expressly contemplated the continued relevance of Section
2's independent statute of limitations, *see id.* at 1051-52, 1056; while the canon against surplusage
counsels this court against "interpret[ing] a statute so as to render it or any portion of it meaningless,"
*Young v. Contributory Ret. Appeal Bd.*, 154 N.E.3d 884, 892 (Mass. 2020) (internal quotation mark
omitted). Consequently, the court concludes a cause of action for wrongful death continues to
"accrue" on the day the decedent passes away, so long as the decedent's own cause of action was
theoretically viable as of the date of death.

[8]  In a response to Plaintiff's supplemental memorandum in opposition to the motion to dismiss,
Defendant raised the possibility that it was immune from suit pursuant to Mass. Gen. Law ch. 258, §
10(b). While "the court need not consider any argument raised in only a perfunctory manner" by way
of a supplemental reply brief, the court will briefly explain why Section 10(b) does not insulate
Defendant from liability. *Groveland Mun. Light Dep't v. Philadelphia Indem. Ins. Co.*, 496 F. Supp. 3d 582,
586 (D. Mass. 2020). Section 10(b) bars "any claim based upon the exercise or performance or the
failure to exercise or perform a discretionary function or duty on the part of a public employer or
public employee, acting within the scope of his office or employment, whether or not the discretion
involved is abused." However, "[a]cts which involve 'the carrying out of previously established policies
or plans,'… , do not warrant immunity [under the discretionary function exception]." *Penate v. Scampini*,
600 F. Supp. 3d 129, 140 (D. Mass. 2022), *aff'd sub nom. Penate v. Sullivan*, 73 F.4th 10 (1st Cir.
2023) (quoting *Irwin v. Town of Ware*, 467 N.E.2d 1292, 1299 (Mass. 1984)) (alteration added). This
limitation is required because the "exception is narrow and applies only to 'discretionary conduct that
involves policy making or planning.'" *Doe I v. City of Northampton*, 659 F. Supp. 3d 122, 133-34 (D.
Mass. 2023) (quoting *Magliacane v. City of Gardner*, 138 N.E.3d 347, 363 (Mass. 2020)). As alleged,

rendering Count VIII viable at this stage. According to Section 10(j), a public employer may not be sued if:

> [the] claim [is] based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.

*See* Mass. Gen. Law ch. 258, § 10(j) (alteration added). In interpreting Section 10(j), the SJC cautioned that the provision was "intended to provide some substantial measure of immunity … [therefore courts] must not adopt an interpretation of the statute that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances." *Brum v. Town of Dartmouth*, 704 N.E.2d 1147, 1154 (Mass. 1999) (alteration added); *see also Jacome v. Commonwealth,* 778 N.E.2d 976, 982 (Mass. App. Ct. 2002) ("[T]he Commonwealth did not originally cause the condition or situation … [h]ence, claims arising from circumstances intimately related to that condition or situation, and the resulting harm, are also barred.").

Plaintiff's negligence-based wrongful death claim relies on the central allegation that Defendant failed to protect N.M. from bullying during the school day, leading to her suicide. But "[f]or § 10(j) to not apply, the claim must involve *something more* than the pure failure to alleviate a private harm and that to be successful a claimant must show *some* involvement of a public employee in creating the injury-causing scenario, not simply a failure to respond adequately after it arises." *Doe v. Town of N. Andover*, No. 1:20-CV-10310-IT, 2023 WL 3481494, at *18 (D. Mass. May 16, 2023) (internal quotation omitted) (alteration in original); *see also Correia v. Town of Westport,* No. 1:16-CV-12408-ADB, 2017 WL 3940931, at *8 (D. Mass. Sept. 7, 2017) ("The Massachusetts Supreme Judicial Court ("SJC") has 'construed the original cause language to mean an *affirmative act* (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third

---

Defendant's relevant acts were carried out in accordance with its previously established municipal policy or custom of misclassifying incidents of bullying. Consequently, Section 10(b) does not apply.

party.'" (quoting *Kent v. Commonwealth*, 771 N.E.2d 770, 775 (Mass. 2002))). As the courts of the Commonwealth have repeatedly held, claims involving suicide are not the result of affirmative acts by public employees. *See, e.g., Paradis v. Frost,* 218 N.E.3d 664, 670 (Mass. App. Ct. 2023), *review denied,* 223 N.E.3d 747 (Mass. 2023) (explaining that, for Section 10(j) purposes, suicide is attributable to the decedent's "own state of mind"); *McCarthy v. City of Waltham*, 924 N.E.2d 316, 322 (Mass. App. Ct. 2010) (same). Consequently, Plaintiff's wrongful death claim is barred by the MTCA's immunity provisions, unless an exception applies.

Only one of the four possible exceptions to immunity, Section 10(j)(1), is relevant to this case. *See* Mass. Gen. Law ch. 258, § 10(j)(1)-(4). Section 10(j)(1) provides:

> [the exclusion will not apply to] any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance.

*See* Mass. Gen. Law ch. 258, § 10(j)(1) (alteration added). As used in Section 10(j)(1), "[t]he phrase 'explicit and specific assurances' requires 'a spoken or written assurance, not one implied from the conduct of the parties or the situation,' and the 'terms of the assurance must be definite, fixed, and free from ambiguity.'" *Ariel v. Town of Kingston*, 867 N.E.2d 367, 370 (Mass. App. Ct. 2007) (quoting *Lawrence v. Cambridge*, 664 N.E.2d 1, 3 (Mass. 1996)). The court agrees with Judge Robertson that the September 10, 2019 Safety and Supervision Plan does constitute an explicit and specific assurance sufficient to implicate Section 10(j)(1)'s immunity exception.[9] By its plain terms, the Safety and

---

[9] *See, e.g., Doe v. Dennis-Yarmouth Reg'l Sch. Dist.,* 578 F. Supp. 3d 164, 174 (D. Mass. 2022) (concluding safety related assurances contained in an IEP satisfy the "explicit and specific" requirement); *Thomas*, 267 F.Supp.3d at 313 ("Superintendent Tiano's statement that '[w]e have teachers in the hallways that monitor things and he will be fine,'…, meets th[e] [Section 10(j)(1)] standard." (alteration added)); *Rhea R. v. Dep't of Child. & Fams.*, 139 N.E.3d 1196, 1201-02 (Mass. App. Ct. 2020), *review denied, case remanded*, 149 N.E.3d 708 (Mass. 2020) (finding foster care agreement between DCF and potential parents constituted "explicit and specific assurance"); *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial*

Supervision Plan was an explicit agreement between N.M., Plaintiff, and NHS, with the specific aim of "securing her physical and emotional safety at school." (Dkt. No. 1-2 at 24.)[10] As alleged, Defendant thereafter failed to secure N.M.'s physical and emotional safety, causing her to suffer a cumulative psychological toll from September to November 2019. Ultimately, Defendant's inability to protect Plaintiff drove her to stop attending school in November of 2019, which compounded her psychological harm, leading to her suicide in January of 2020. When viewed in a light most favorable to Plaintiff, this suicide was the result, at least in part, of Defendant's ineffective implementation of the Safety and Supervision Plan's "explicit and specific" assurance that N.M. would be protected from the physical and emotional harm caused by bullying, as well as from the foreseeable consequences of that bullying such as suicide.[11] Consequently, Section 10(j)(1)'s exception applies.

    *3. Duty of Care*

---

*Ct.*, 858 N.E.2d 699, 714-15 (Mass. 2006) (holding oral and written representations regarding asbestos abatement projects were sufficiently "explicit and specific" to trigger application of Section 10(j)(1)).

[10] In response, Defendant argues classifying school promulgated safety plans as "explicit and specific" assurances would "negate any incentive to create such a plan." The court does not find this position persuasive, as "school officials [have a] duty [under the Massachusetts constitution] to provide children an adequate public education [and this duty] includes the duty to provide a safe and secure environment in which all children can learn." *Doe v. Superintendent of Sch. of Worcester*, 653 N.E.2d 1088, 1096 (Mass. 1995) (alteration added); *see also Doe v. Superintendent of Sch. of Stoughton*, 767 N.E.2d 1054, 1057-58 (Mass. 2002). Put differently, were Defendant to forego providing safety plans based on a fear of being held civilly liable for failing to implement the plan, Defendant would also be in legal jeopardy for failing to protect students. Moreover, Defendant's fear is avoided by ensuring sufficient resources are available to fully implement the safety plan.

[11] The court draws an analytical distinction between the importance of the Safety and Supervision Plan for Section 10(j)(1) immunity purposes and the importance of the Safety and Supervision Plan as it relates to demonstrating whether Defendant satisfied its duty of reasonable care toward N.M. As relevant to the duty of care, the plan's existence and Defendant's compliance with the plan may well constitute evidence that Defendant satisfied its duty of reasonable care. The converse is also true, as failure to comply with the plan may constitute evidence that Defendant did not satisfy its duty of reasonable care. Ultimately, the plan's impact on the substantive elements of Plaintiff's negligence claim presents a factual issue better resolved with the benefit of a developed record.

In a final objection, Defendant contends Judge Robertson "created" a new duty of care, not recognized by Massachusetts law, between a public-school student at foreseeable risk of suicide and a public school. This argument is unavailing. As the First Circuit has explained, "[a]pplying state law involves 'interpreting and applying the rules of substantive law enunciated by the state's highest judicial authority, or, on questions to which that tribunal has not responded, making an informed prophecy of what the court would do in the same situation.'" *Aubee v. Selene Fin. LP*, 56 F.4th 1, 4 (1st Cir. 2022) (quoting *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir. 1996)). In making this informed prophecy, the court's task "is to ascertain the rule the state court would most likely follow under the circumstances," by relying on "guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Id.* Ultimately, "[w]hether a defendant has a duty of care to the plaintiff in the circumstances is a question of law …, to be determined by reference to existing social values and customs and appropriate social policy." *Lanier v. President & Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1073 (Mass. 2022) (quoting *O'Sullivan v. Shaw*, 726 N.E.2d 951, 954 (Mass. 2000)).

Judge Robertson engaged in a thorough analysis of the closest analogous precedent, *Nguyen v. Mass. Inst. of Tech.*, 96 N.E.3d 128 (Mass. 2018). In analyzing this decision, Judge Robertson concluded the SJC's logic with respect to the duty between universities and their students at foreseeable risk of suicide applied with equal force to public schools and public-school students also at foreseeable risk of suicide.[12] As described in *Nguyen*, this duty exists when:

---

[12] In an attempt to distinguish *Nguyen*, Defendant argues the case's holding was limited to "facts involving an extremely well-financed university." The court does not find this distinction persuasive. Furthermore, this court declines to endorse the premise that the duty owed by a school to a minor child turns on the relative endowment of the institution. Defendant's proposed distinction is antithetical to the Commonwealth's "public commitment to education" which, as the SJC has recognized, predates the founding of the United States by over 130 years. *McDuffy v. Sec'y of Exec. Off. of Educ.*, 615 N.E.2d 516, 524-41 (Mass. 1993); *Cushing v. Newburyport,* 51 Mass. 508, 511 (1845) ("The establishment of schools for the education …, of all the children of the whole people, is not the result

> a student has attempted suicide while enrolled at the university or recently before
> matriculation, or has stated plans or intentions to commit suicide, [in these
> circumstances] suicide is sufficiently foreseeable as the law has defined the term, even
> for university nonclinicians without medical training.

96 N.E.3d at 144 (alteration added). This formulation applies to the sequence of events alleged in the

complaint. As alleged, Defendant was aware of N.M.'s May 2019 suicide attempt; this suicide attempt

occurred while she was enrolled at NHS and resulted in N.M's hospitalization. Defendant was also

aware of a subsequent investigation by DCF into the suicide attempt, as well as further expressions of

suicidal intent in the fall of 2019. Moreover, in *Nguyen*, the SJC recognized the existence of a duty

despite university students being much older than N.M. (Nguyen was himself a 25-year-old graduate

student), and despite concluding the doctrine of *in loco parentis* no longer described the university-

student relationship. *Id.* at 131-32, 141. By contrast, high school students are between the ages of 14-

18, heightening the SJC's concerns regarding "immaturity and need for protection," *id.* at 142, while

the doctrine of *in loco parentis* remains applicable in the pre-university stages of schooling, *Murray v.*

*Town of Hudson,* 34 N.E.3d 728, 733 n. 8 (Mass. 2015) (citing *Driscoll v. Bd. of Trustees of Milton Acad.,*

873 N.E.2d 1177, 1193 (Mass. App. Ct. 2007) (Mills, J., concurring in part, dissenting in part)). Thus,

the concerns animating the SJC's reasoning in *Nguyen* are not diminished when applied in the context

of public schools, but rather they are heightened by the greater level of immaturity and deeper degree

of emotional vulnerability inherent in K-12 students. Therefore, the court concludes that under

Massachusetts law, a public school owes a duty of reasonable care to a minor child when the school

has actual knowledge of a previous suicide attempt, or when the student has stated plans or intentions

to commit suicide of which the school has actual knowledge; in these circumstances a second suicide

attempt is foreseeable as the law has defined the term. This result is compelled by the SJC's ruling in

---

of any recent enactment; it is not the growth even of our present constitutional government, or the
provincial government which preceded it, but extends back two hundred years, to the early settlement
of the colony.").

*Nguyen.*

In addition to adopting Judge Robertson's *Nguyen* analysis, this court further notes that Judge Robertson's conclusion is supported by the entire range of interpretive tools set forth in *Aubee*. For example, in *Paradis v. Frost*, 218 N.E.3d 664 (Mass. App. Ct. 2023), the Massachusetts Appeals Court expressly stated: "Paradis argues that the principles of *Nguyen* should extend to public school districts … Paradis's argument has some force." *Id.* at 673. Ultimately, the *Paradis* court did not address the issue because it found the suit was barred by sovereign immunity on grounds not applicable here, but this *dictum* is strong indicia the Massachusetts Appeals Court would also recognize public schools owe a special duty to students at foreseeable risk of suicide. *Id.*[13] In other contexts, Massachusetts courts have not hesitated to recognize public schools owe duties to their students. *See, e.g., Murray v. Town of Hudson,* 34 N.E.3d 728, 732-33 (Mass. 2015) (holding "if the recreational use statute were applied to injuries children suffered while on school premises as students, the special relationship of the school to its students would be substantially impaired") (quoting *Bauer v. Minidoka Sch. Dist. No. 331*, 778 P.2d 336 (Idaho 1989))); *Sharon v. City of Newton,* 769 N.E.2d 738, 748 n. 12 (Mass. 2002) (recognizing "the special relationship that exists between a school and its students"); *Dugan v. Thayer Acad.*, No. 14-1359-C, 2015 WL 3500385, at *4 (Mass. Super. May 27, 2015) (recognizing school's duty to evaluate head injuries suffered during interscholastic athletic competition).[14] Similarly, the Restatement (Third) of

---

[13] Defendant frames *Paradis* as an explicit rejection of the extension of *Nguyen* to public schools. However, the court does not find this reading persuasive, as by expressing an opinion—and a favorable one at that—regarding *Nguyen*'s application to the case despite the application of sovereign immunity, the Massachusetts Appeals Court foreshadowed how it would have addressed *Paradis*'s arguments on the merits. Moreover, Defendant's argument that the SJC's refusal to grant *Paradis* leave to appeal is indicative of its position on the question is unavailing, as "[a]n order by [the SJC] denying further review should not be considered in any case as an affirmation of the decision or reasoning of the Appeals Court." *Ford v. Flaherty*, 305 N.E.2d 112, 116-17 (Mass. 1973) (alteration added).

[14] In addition to these Massachusetts rulings in differing areas of substantive law, courts in other jurisdictions have recognized that schools may owe a duty to a child at foreseeable risk of harm from either themselves or third parties. *See, e.g., Barlow v. State,* 540 P.3d 783, 786-87 (Wash. 2024) (noting a

Torts: Liability for Physical and Emotional Harm, § 40(b)(5), which was cited by the SJC in *Nguyen*,

categorizes "a school'[s] [relationship] with its students" as the type of special relationship giving rise

to a duty. Finally, the public policy of the Commonwealth of Massachusetts, as set forth in both

statutory and decisional law, is at the forefront of combatting the harmful impact of bullying with the

aim of suppressing instances of adolescent suicide.[15] This consistent public policy further supports the

---

special relationship imposing a duty exists at the "K-12" level of education, limiting extension of the
duty in the university context); *Spring v. Allegany-Limestone Cent. Sch. Dist.*, 221 A.D.3d 1474, 1476, 200
N.Y.S.3d 594 (N.Y. App. Div. 2023), *reargument denied*, 224 A.D.3d 1335, 202 N.Y.S.3d 875 (N.Y. App.
Div. 2024) ("[School district's] negligence in failing to adequately address and safeguard against
harassment and bullying directed at decedent at school caused decedent to suffer mental disturbance
destroying [his] will to survive" (internal quotation marks omitted)); *Fitzpatrick v. Grove Sch., Inc.*, No.
NNHCV206107306, 2021 WL 2182918, at *5-6 (Conn. Super. Ct. May 4, 2021) (recognizing a school
has a duty when it has actual knowledge of prior suicide attempts or suicidal ideation); *Wyke v. Polk
Cnty. Sch. Bd.*, 129 F.3d 560, 574-75 (11th Cir. 1997), *certified question withdrawn*, 137 F.3d 1292 (11th Cir.
1998) (recognizing school board owed student some duty considering its knowledge of the student's
"two recent, overt suicide attempts"); *Logarta v. Gustafson*, 998 F. Supp. 998, 1005 (E.D. Wis. 1998)
(explaining "sometimes the teacher-student relationship associated with schools" gives rise to a special
duty to prevent suicide) ; *Eisel v. Bd. of Educ. of Montgomery Cnty.*, 597 A.2d 447, 452-456 (Md. 1991)
(recognizing schools have a duty to take reasonable measures to prevent a foreseeable adolescent
suicide). As is the case here, many of these decisions turn on the school district's awareness of previous
suicide attempts or specific manifestations of suicidal intent. In the circumstances of this case, the
court concludes recognizing that Massachusetts law imposes a duty on Defendant is in harmony with
the persuasive decisions of other jurisdictions.

[15] In concluding the public policy of Massachusetts strongly favors the suppression of adolescent
bullying and the prevention of youth suicide, the court looks first to Mass. Gen. Law ch. 71, § 37O.
This provision broadly prohibits bullying, requires school districts to develop comprehensive plans to
prevent bullying, and mandates school districts investigate bullying. *See* Mass. Gen. Law ch. 71, § 37O
(b), (d)(1)-(6), and (g). The Massachusetts General Court was spurred to action by the tragic suicides
of two western Massachusetts youths, Carl Walker-Hoover (11-years old) of Springfield and Phoebe
Prince (15-years old) of South Hadley. These tragedies occurred in April 2009 and January 2010
respectively, just months before the General Court enacted Section 37O. *See* Natalie Higgins, "Bullying
Is The New Harassment, But Are Our Students Any More Protected," 5 NE. U.L.J. 133, 135-37, 140-
43 (2013) (exploring the context of the Massachusetts anti-bullying legislation). As additional evidence,
the Commonwealth has been at the forefront with respect to holding individuals criminally responsible
for their role in teenage suicide, with the SJC rejecting the antiquated notion "that verbal conduct can
never overcome a person's willpower to live, and therefore cannot be the cause of a suicide."
*Commonwealth v. Carter ("Carter I")*, 52 N.E.3d 1054, 1061-62 (Mass. 2016); *see also Commonwealth v. Carter
("Carter II")*, 115 N.E.3d 559, 572 (Mass. 2019) (recognizing the Commonwealth's "compelling interest
in preserving life" would justify the General Court proscribing "[the] wantonly or recklessly pressuring
of a person to commit suicide that overpowers that person's will to live"). These actions, by both the

court's "informed prophecy" that Massachusetts law recognizes the existence of a duty of reasonable care between a public school and a student at foreseeable risk of suicide. Accordingly, the court adopts Judge Robertson's recommendation to deny the motion to dismiss Count VIII.

### IV.   CONCLUSION

Ultimately, "plaintiff has raised a right to relief above the speculative level on [Counts V, VI (other than the emotional damages request), VII, and VIII], and is [therefore] entitled to discovery." *Arbor Networks, Inc. v. Ronca*, No. CIV.A. 12-11322-FDS, 2012 WL 5610835, at *6 (D. Mass. Nov. 14, 2012) (alteration added). However, the court is cognizant that relevant discovery in this matter will implicate the privacy interests of juveniles beyond N.M. As a result, the court intends to put protocols in place requiring the parties to identify documents which may require the court's review *in-camera* before ordering (or denying) their production. Consequently, the parties' proposed initial Rule 16 report should include a proposed confidentiality order governing the exchange and review of confidential records. As the court anticipates the discoverable material will include the names, records, and statements of various individuals who were juveniles during the relevant time frame, the parties should also present a proposed protocol for informing the third parties that potentially privileged or confidential information about them will be disclosed during this litigation.[16] The parties' Rule 16 report, proposed confidentiality order, and proposed third-party notification protocol shall be filed by July 22, 2024.

---

General Court and the SJC, evidence a recognition that bullying, and the concomitant risk of adolescent suicide that flows from unchecked bullying, are social evils which must be suppressed. By accepting Defendant's argument, this court would necessarily have to ignore the Commonwealth's policy choice in favor of imposing more (not less) legal responsibility on institutions and individuals positioned to prevent bullying and its all too foreseeable consequence—adolescent suicide.

[16] In preparing the proposed confidentiality order and protocol, the parties will likely find *Doe v. City of Northampton*, 19-cv-30027-MGM (D. Mass.) instructive. Specifically, Docket Numbers 31, 33, and 47.

In conclusion, the court adopts Judge Robertson's Report and Recommendation (Dkt. No. 38.) Consequently, Defendant's motion to dismiss for failure to state a claim (Dkt. No. 16) is granted in part and denied in part. Specifically, the motion is granted as to Counts I, II, III, and IX, rendering these counts dismissed with prejudice. The motion is granted in part as to Count VI, rendering the emotional damages request in this count dismissed with prejudice. Finally, the motion is denied with respect to Counts V, VI in so far as it seeks damages not sounding in emotional distress, VII, and VIII.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge