UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANE DOE,

Plaintiff,

v.

CITY OF NORTHAMPTON,

Defendant.

Civil Action No. 23-10358-MGM

MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 113)
August 31, 2026

MASTROIANNI, U.S.D.J.

## I. Introduction

Following the court's July 1, 2024, order on Defendant's motion to dismiss, Plaintiff's remaining claims are violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count V), violation of Title VI of the Civil Rights Act of 1964 (Count VI), retaliation for conduct protected by the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights ("MDR") (Count VII), and wrongful death (Count VIII). Defendant moved for summary judgment on all counts pursuant to Federal Rule of Civil Procedure 56.

The court concludes that genuine issues of material fact preclude summary judgment on Counts V (14th Amendment Claim), VI (Violation of Title VI of the Civil Rights Act of 1964 Claim), and VIII (Wrongful Death Claim). The court grants summary judgment as to Count VII (Retaliation under the First Amendment and the MDR Article 16).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those facts that have the potential to affect the outcome of the suit under the applicable law." *Hewes v. Pangburn*, 162 F.4th 177, 196 (1st Cir. 2025) (internal quotation marks omitted). Disputes, on the other hand, are "genuine when the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Quintana-Dieppa v. Dep't of the Army,* 130 F.4th 1, 7 (1st Cir. 2025) (internal quotation marks omitted). The court views the record in the light most favorable to the non-moving party with all reasonable inferences drawn in Plaintiff's favor. *See Hews*, 162 F.4th at 196.

## III. BACKGROUND

The relevant factual background starts when N.M., who was a biracial Hispanic and African-American girl, attended middle school, where she did not have any disciplinary issues, and by eighth grade, her counselor noted significant academic and emotional progress. (Dkt. No. 139 ¶157; 147-43 at 53; 148-23 at 18-19.) Following eighth grade, during the summer of 2018, N.M. began to experience issues with a few of her peers, including A.M., J.F., and O.D., who all began attending Northampton High School ("N.H.S.") with her later that fall. (Dkt. No. 148-4.) In August 2018, these issues were brought to N.H.S.'s attention during an Individualized Education Plan ("IEP") meeting. (Dkt. No. 139, para. 28.) During that meeting, participants "discussed whether or not [N.M.] present[ed] at an elevated risk of bullying and determined that she present[ed] with significant risk factors," but that such risks could be addressed through "counseling and instruction in self-advocacy." (Dkt. No.148-24 at 17.) During the fall and winter of 2018, N.M. continued to experience negative interactions, including an incident that involved J.F. slapping N.M.'s hand away,

and another altercation in which N.M. was deemed not to be the aggressor. (Dkt. Nos. 148-4 at 29; 17; 33.)

In November 2018, feeling disliked by her adjustment counselor, Andrea Leydon ("Leydon"), N.M. began declining sessions with her. (Dkt. No. 148-13 at 94; 148-27 at 3.) In January 2019, Leydon informed Plaintiff that one of N.M.'s friends messaged J.F. to tell her that if N.M. committed suicide, it would be J.F.'s fault. (Dkt. No. 148-32.) At the time, Leydon did not inform the Assistant Principal Celese Malvezzi ("Malvezzi") about that message. (Dkt. Nos. 148-17 at 142.) Around this same time period (January to February 2019), J.F. took a Snapchat picture with Leydon ("the J.F. Snapchat Incident") and sent it to N.M. with a caption stating that Leydon hates her. (Dkt. No. 148-14 at 90.) Leydon did not address the picture with N.M. or with J.F., even after being informed about it by Plaintiff during a February 15, 2019, IEP meeting. (Dkt. No. 148-14 at 129; 148-9 at 22.) On January 29, 2019, N.M. spent a significant amount of time in Leydon's office sharing that she wanted to leave N.H.S. and felt as if she could not make it there. (Dkt. No. 148-34.)

On February 7, 2019, N.M.'s childhood psychologist, Dr. Waslick, sent a Home Hospital Form to medically excuse N.M. from attending school until April 30, 2019 (Dkt. No. 139 ¶ 79; Dkt. No. 148-35), but school officials did not comply with it because of what they perceived as issues with the form. (Dkt. No. 148-29.) On February 15, 2019, the second IEP meeting was held, in which Malvezzi, Leydon, and Plaintiff participated. (Dkt. No. 148-36.) During the meeting, Malvezzi and the other participants were made aware of multiple allegations of bullying towards N.M., including the J.F. Snapchat Incident, and that N.M. was terrified to attend school because of bullying. (Dkt. Nos. 148-17; 19; 36.) At the time, it was N.H.S.'s policy to investigate allegations of bullying or cyberbullying where the behaviors had an impact on what was happening in the school, and Malvezzi later acknowledged that a bullying investigation should have been initiated following that IEP meeting. (Dkt. Nos. 148-17; 22.)

On March 13, 2019, N.H.S. received a second note from Mr. Waslick attributing N.M.'s unprecedented lack of attendance to the deterioration of her mental health. (Dkt. No. 148-37.) On March 26, 2019, N.M. went to the crisis unit at Cooley Dickinson Hospital (Dkt. No. 148-40), and upon her release, the hospital provided a third note medically excusing N.M. from attending school until she was cleared by a particular unit. (Dkt. No. 148- 41.) N.H.S., as with the previous two medical notes, found it insufficient to excuse N.M. from school. (Dkt. No. 139 ¶102.) Dr. Waslick saw N.M. again on April 4, 2019, found her mental health to be deteriorating due to school and interactions with peers, and on the same day, issued a fourth medical note medically excusing N.M. from attending. (*Id.* ¶¶ 103-104.)

On April 11, 2019, N.M. overdosed. (Dkt. No. 147-10.) During her stay at a treatment center following her overdose, she shared with the medical staff that she needed the bullying to stop and that she was not understanding why N.H.S. waited so long to help her. (Dkt. No. 148-43.) On May 10, 2019, she told a DCF investigator that bullying led her to overdose. (Dkt. No. 148-2 at 4.) On May 15, 2019, N.M. returned to school and told Leydon, "This is what bullying will do to you," in reference to her suicide attempt (*Id.* at 12.), a statement that Malvezzi later acknowledged Leydon should have reported to her but did not. (Dkt. No. 148-19 at 18-19.) Later that same day, N.M. again overdosed. (Dkt. No. 147-12.)

During the summer of 2019, peers created a "Roast N.M." Snapchat group, in which A.M., J.F., and other participants used derogatory terms to describe N.M., including one participant who stated that N.M. should kill herself. (Dkt. No. 147-5.) The Snapchat group was investigated by N.H.S.'s School Resources Officer ("SRO") Wallace, a Northampton Police Department officer, who described the group activities to Malvezzi as "online bullying or harassment," and informed N.H.S. administration about N.M.'s overdoses. (Dkt. No. 148-16.) On August 28, 2019, N.M. met with Malvezzi and Edward Stone ("Stone"), her new adjustment counselor, and after that meeting,

Malvezzi explicitly decided that a bullying investigation should be initiated. (Dkt. No. 139 ¶¶ 147, 149.) Malvezzi assigned an N.H.S. administrative official to investigate, but the official did not initiate any investigation because she was unaware of her assignment as an investigator. (Dkt. No. 147-19 at 58; 47.) Despite Malvezzi's determination that an investigation was required, no investigation was initiated at any point by any N.H.S. official after the meeting; rather, a safety plan was established. (Dkt. No. 148-17 at 25; 47; 19 at 22.)

On September 7, 2019, peers created another Snapchat group ("N.H.S. Cheerleaders") in which N.M., J.F., R.I., and A.L. participated and in which a peer made a comment that N.M. had "poop on her face" and that she was not black. (Dkt. No. 139 ¶¶ 156, 157.) On September 9, 2019, just two days after those messages and despite a safety plan, N.M. was attacked by R.I., and J.F. was involved as well. (*Id.* ¶ 158.) Within the following week, N.M informed N.H.S. about the Cheerleaders groupchat that had immediately precipitated R.I.'s attack, but later N.H.S. officials could not recall investigating the texts that were exchanged in the group chat, despite acknowledging that such texts were important to the investigation. (*Id.* ¶¶ 160-162.) During that same week, N.M. also made homicidal and suicidal statements to Stone and Malvezzi. (*Id.* ¶ 163.) On November 19, 2019, N.M. and Plaintiff told Stone that another student, S.C., was going to beat N.M. up. (Dkt. No. 148-11; 12 at 5; 13.) Stone did not report these threats, despite being obligated to do so, and one day later, N.M. was, in fact, physically attacked by S.C. (Dkt. No. 148-13 at 13; Dkt. No. 139 ¶ 170.) As recently as one week before her suicide, N.M. was expressing her desire to go to a "normal" school. (Dkt. No. 147-37 at 6.)

At some point during N.M.'s time at N.H.S., A.M. made a comment to N.M. inquiring why she wore braids as a non-African-American. (Dkt. No. 148-4 at 13.) During the fall of 2019, Malvezzi made comments to N.M. referencing Sasha Fierce, Beyonce's alter ego, in an attempt to explain to N.M. that she did not need to come to N.H.S. with eyelashes and makeup on. (Dkt. No.

148-19 at 28-29.) Moreover, during 2019, N.M. reported to Stone on numerous occasions that she was bullied, other students had problems with her because of her race and her appearance, and her perceived racial identity impacted her daily at school. (Dkt. No. 148-15.)

On January 30, 2020, N.M. committed suicide at her home. (Dkt. No. 147-34.)

## IV. DISCUSSION

### A. Count V

A 14th Amendment Claim brought pursuant to 42 U.S.C. § 1983 requires a plaintiff to demonstrate conduct by a person acting under color of state law who caused a "deprivation of the plaintiff's federally protected rights." *Hewes,* 162 F.4th at 190 (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)). There is no dispute that the City's employees were operating under the color of law. As to the constitutional violation, Plaintiff asserts a substantive due process claim. "To establish a substantive due process claim, [Plaintiff] must show a deprivation of a protected interest in life, liberty, or property and that the deprivation of this protected right was caused by governmental conduct." *Doe v. City of Boston*, 145 F.4th 142, 150 (1st Cir. 2025) (internal quotation marks omitted). And where, as here, "a plaintiff's substantive due process claims challenge the constitutionality of certain executive acts, 'the plaintiff must [also] show . . . that the acts were so egregious as to shock the conscience.' " *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *Pagán v. Calderón,* 448 F.3d 16, 32 (1st Cir.2006)).

It is recognized that "[i]n general, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Morgan v. Town of Lexington, MA,* 823 F.3d 737, 742 (1st Cir. 2016) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989)). However, there are exceptions to this general rule, including the "state-created danger" doctrine. *See Irish v. Fowler*, 979 F.3d 65, 67 (1st Cir. 2020). But Defendant has not raised any *DeShaney*-based argument, and has thus deprived Plaintiff of the chance to respond

and develop the applicability of the state-created danger exception. The court therefore finds Defendant has waived this issue for purposes of summary judgment.

Accordingly, the court moves on to examine whether a jury could reasonably find that there is evidence to show that Defendant, who had the "opportunity to make unhurried judgments," showed "deliberate indifference [that] may shock the conscience." *Irish*, 979 F.3d at 75 (noting that the "state official perform[ed] multiple acts of indifference to a rising risk of acute and severe danger" in finding deliberate indifference). "To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk." *Id.*

Here, "a fair-minded jury could return a verdict for the plaintiff on the evidence presented," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), as to the conscience-shocking conduct of N.H.S. in enhancing the danger from bullying that N.M. faced and thereby violating N.M.'s due process right to bodily integrity. *See Doe1 v. Bos. Pub. Schs.,* No. 17-CV-11653-ADB, 2019 WL 1005498, at *5 (D. Mass. Mar. 1, 2019) ("[E]xactly what conduct will be conscious-shocking varies according to context, and deliberate indifference may suffice 'where actors have an opportunity to reflect and make reasoned and rational decisions'" (quoting *J.R. v. Gloria,* 593 F.3d 73, 80 (1st Cir. 2010)). Specifically, a jury could reasonably find that N.H.S. was on notice as to the significant risk N.M. faced in being a victim of bullying as soon as she enrolled at N.H.S. Interpreting the facts and inferences in the light most favorable to Plaintiff, subsequent events after her enrollment signaled to N.H.S. the increasing severity of the alleged bullying. This is evidenced by SRO Wallace describing N.M. as a cyberbullying victim, N.H.S. becoming aware of N.M.'s previous two overdoses, Stone being warned by Plaintiff about the S.C. attack but taking no action in response, and N.M. being the victim of two physical attacks despite her safety plan. *See J.R.,* 593 F.3d at 80 (finding that "state officials must have been at least aware of known or likely injuries or abuse and have chosen to

ignore the danger to the child" in the foster care context); *Armijo v. Wagon Mound Pub. Schs.,* 159 F.3d 1253, 1264 (10th Cir.1998) (finding the record supported a jury finding that the defendant had "acted recklessly in conscious disregard of the risk of suicide," if the defendant had known when suspending and sending a special education student home, without notifying his parents, that he had threatened suicide and had access to firearms).

There is ample evidence to show that N.H.S. was also aware of how the intensified in-person and cyber-harassment was impacting N.M. Aside from the issue of her lack of attendance, N.H.S. was aware that she tried to commit suicide twice and that she had linked her first suicide attempt to the bullying. Moreover, a jury could reasonably infer N.H.S. showed deliberate indifference by requiring N.M. to attend school while not addressing her psychological and physical safety concerns that had prompted her getting four doctor's notes to medically excuse her from attending N.H.S. in the first place. Finally, Malvezzi acknowledged a bullying investigation was never initiated but should have been as far back as February 2019. Moreover, even when Malvezzi documented the need for such an investigation in August 2019, no investigation was ever actually initiated. Considering these indicia together, the record could support a jury finding as to deliberate indifference towards N.M.'s Fourteenth Amendment right to bodily integrity.

Because a municipality cannot be held vicariously liable for the conduct of its officials or employees under § 1983, the plaintiff's civil rights claims against Defendant are governed by *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658 (1978). Viewing the evidence in the light most favorable to Plaintiff, a jury could find that the City followed an informal municipal "custom or usage," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, n.10 (1986), of misclassifying bullying as "peer-on-peer conflict," thereby allowing the City to avoid conducting bullying investigations even when recognizing the likely existence of a bullying claim.

The inference as to existence of this informal policy is supported by N.H.S.'s lack of a codified definition for "peer-on-peer conflict" while N.H.S. officials reference the term as if it is part of their formal policy.[1](Dkt. No. 153.) During the July 7, 2026, summary judgment hearing, Defendant did not provide the court with a specific definition of "peer-on-peer conflict," but generally described it as consisting of issues between children who are not getting along, do not have healthy coping mechanisms or conflict resolution skills, or are both engaging in physical aggression. The court asked Defendant whether the City of Northampton or N.H.S. has a formal, written definition of the phrase that can be found in material produced by any party during discovery. Defendant answered in the affirmative, stating that the definition can be found in a lot of the material seen throughout the case. After the hearing and upon a thorough review of the record, the court did not find a codified or formal definition of peer-on-peer conflict used by the City or N.H.S. The court requested that Defendant provide such definition. (Dkt. No. 149.) Defendant responded that the phrase "peer on peer conflict" "is not codified in the City's policies and procedures," but rather that it is "nomenclature used by educators to describe various type[s] of interpersonal conflict between students." (Dkt. No. 153.) Defendant did not provide any explanation or citation to the record that would exemplify how N.H.S. educators used or applied the "peer on peer conflict" term. Defendant also included *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6498959 at *1 (D. Mass. Dec. 10, 2013) and a citation to a National Bullying Prevention Center website that describes the difference between conflict and bullying. Defendant does not allege and there is no

[1] The parties used "peer on peer conflict," "peer to peer conflict," and "peer conflict" interchangeably in their briefing as well as during the July 7, 2026, hearing. The court views these three terms as being used synonymously because of the operative word "conflict." For the sake of clarity and consistency, the court will use the term "peer on peer conflict."

evidence that it considered this or any other National Bullying Prevention Center websites in addressing concerns that N.M was a bullying victim.[2]

In *Doe v. Town of Stoughton*, there is no mention of the term "peer-on-peer conflict," and, instead, the terms "peer-to-peer" and "peer-on-peer" harassment are used interchangeably to describe the incessant gender and sex-based harassment that the plaintiff faced which resulted in her two attempts to commit suicide. *Doe v. Town of Stoughton*, 2013 WL 6498959 at *1-*6.[3] That court uses the terms "peer-to-peer" and "peer-on-peer" harassment in a manner that appears synonymous with bullying and in the specific context of analyzing Plaintiff's gender and sex-based discrimination claims made pursuant to the Equal Protection Clause and the Massachusetts Fair Educational Practices Act. *See Doe v. Town of Stoughton*, 2013 WL 6498959 at *2 (finding that "an alleged *victim* of peer-to-peer harassment must show that she was afforded a lower level of protection than other students as a result of her membership in a protected class") (emphasis added); *id.* at *4 (an "alleged *victim* of peer-on-peer harassment must demonstrate that the officials treated her differently from others similarly situated, either intentionally or with deliberate indifference") (emphasis added); *id.* at

[2] No National Bullying Prevention Center-related websites or materials are part of the record or referenced in either party's statement of facts. Accordingly, the court's analysis is not informed by this website. However, the court notes that this website defines "conflict" as "a disagreement or argument in which both sides express their views." PACER Center (National Bullying Prevention Center), Conflict vs. Bullying: What's the Difference?, https://www.pacer.org/bullying/info/questions-answered/conflict-vs-bullying/ (last visited Aug. 19, 2026). The website goes on to explain that "conflict" includes a "disagreement or argument in which both sides express their views"; there is "equal power between those involved"; and the party or parties "generally stop and change behavior when they realize it is hurting someone." *Id.* Bullying, on the other hand, can be defined as "negative behavior directed by someone exerting power and control over another person." *Id.*

[3] While Defendant correctly notes in its supplemental briefing that the court found in favor of the Town of Stoughton at summary judgment as to the Fourteenth Amendment and the Massachusetts Fair Educational Practices Act, the court also denied summary judgment as to Title IX and Negligence. *See Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6195794, at *1 (D. Mass. Nov. 25, 2013).

*5 (describing the conduct of the plaintiff's daughter's peers as consisting of "peer-to-peer harassment," specifically sexual harassment as defined under Mass. Gen. Laws Ann. ch. 151C, § 1(e)(iii) which has "the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment," but ultimately finding no cause of action against the Town of Stoughton under the statute). Defendant appears to conflate "peer on peer conflict," which can be viewed as mutual conflict with no victim, with "peer on/or peer harassment," which requires a "victim," *Id.* at *2, *4, *5. The presence of a victim makes "peer on/or peer harassment" more akin to, if not synonymous with, bullying rather than peer-on-peer conflict.

Defendant's conflation of these terms appears to be a natural extension of N.H.S.'s persistent misclassification of "peer on peer conflict" with "bullying" seen throughout this case. N.H.S. officials' use of the term in a school setting and the City's use of the term in briefing and during oral argument creates a false perception that Defendant has and follows a comprehensive written, standardized policy. However, a jury could find that N.H.S. used an amorphous and uncodified definition of "peer on peer conflict" as an escape mechanism to avoid investigating legitimate bullying allegations, including those of N.M. Thus, N.H.S. was able to, at times, arbitrarily relegate all bullying claims that were not investigated to the shape-shifting category of "peer on peer conflict." N.H.S.'s misclassification of bullying complaints and the resulting failure to investigate such complaints disproportionately affected students of color, such as N.M. *See Grace v. Bd. of Trs., Brooke E. Bos.,* 85 F.4th 1, 5 (1st Cir. 2023) (noting that Brooke Charter School East Boston had no definition of "peer-to-peer conflict" while repeatedly characterizing a peer's aggressive behavior toward the defendant's son as "peer-to-peer conflict" rather than bullying).

A jury could reasonably find that this unofficial municipal policy violated N.M.'s substantive due process right to bodily integrity by exacerbating the bullying-related danger she faced which

resulted in her taking her own life. *See L.K.M. v. Bethel Sch. Dist.,* No. C18-5345 BHS, 2021 WL 1531088, at *5-*6 (W.D. Wash. Apr. 19, 2021) (denying Defendant's motion for summary judgment as to the *Monell* Fourteenth Amendment bodily integrity claim because a jury could find that the superintendent's failure to report an incident involving the plaintiff and her abuser despite the district's mandatory-reporting policy could be attributable to the district if the superintendent possessed final policymaking authority); *Doe v. Gavins,* No. 22-CV-10702-ADB, 2023 WL 6296398, at *10 (D. Mass. Sept. 27, 2023) (finding that the plaintiffs, at the motion to dismiss stage, had "adequately pleaded municipal liability for violations of their children's right to bodily integrity" by showing Defendant's inaction in response to numerous complaints reporting inappropriate sexual touching and misconduct as well as physical bullying); *Doe1 v. Bos. Pub. Schs.,* No. 17-CV-11653-ADB, 2019 WL 1005498, at *9 (D. Mass. Mar. 1, 2019) (finding that the plaintiffs had shown at the motion to dismiss stage "the existence of a municipal custom that discouraged" the filing of 51A (child abuse or neglect) reports); *Doe v. Town of Wayland,* 179 F. Supp. 3d 155, 173 (D. Mass. 2016) (finding that the plaintiff had provided "factual support for an inference that socially engineering dangerous friendships was an official custom or policy" under *Monell*). While parties at the summary judgment stage must meet a more exacting standard than at the motion to dismiss stage, *see Cochran v. Quest Software, Inc.*, 328 F. 3d. 1, 8 n. 2 (1st Cir. 2003), the court nevertheless finds the reasoning of these cases applicable to Plaintiff's *Monell* claim at the summary judgment stage because there is evidence in the record to suggest that the informal custom was "so permanent and well settled as to constitute a custom or usage with the force of law." *Lavigne v. Great Salt Bay Community School Board,* 146 F.4th 95, 125 (1st Cir. 2025).

A jury could find that there existed a systematic pattern of activity demonstrating "serial misconduct" sufficient to show the existence of a custom solely based on N.M.'s experience. *Baron v. Suffolk Cnty. Sheriff's Dep't,* 402 F.3d 225, 239 (1st Cir. 2005) (finding that although the plaintiff had

not alleged that others were subjected to the same allegedly unconstitutional customs or practices, evidence of "multiple incidents of misconduct" that suggest a "systemic pattern of activity, may support an inference of a municipal custom"), *abrogated on other grounds by Jennings v. Jones*, 587 F.3d 430 (1st Cir. 2009). There is also evidence suggesting that the N.H.S.'s custom of mislabeling "peer on peer" conflict and not conducting bullying investigations even when warranted disproportionately impacted other students of color in addition to N.M. It is undisputed that N.H.S. has struggled with students of color being disproportionately subjected to exclusionary forms of discipline (Dkt. No. 148-55), while bullying complaints made by students of color are less likely to be "formally investigated, identified, or substantiated." (Dkt. No. 148-8 at 22.) The court considers the latter assertion to be undisputed because while Defendant "denied" it, Defendant did not properly support its assertion. *See* Fed. R. Civ. P. 56(e)(2)). While the court notes that potential flaws with the Plaintiff's expert report make it ripe for critique, no challenge has been initiated by Defendant, and at summary judgement, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). Moreover, J.F., a student of color, reported to Leydon that she was being bullied by N.M., but Leydon failed to alert the school administration, as N.H.S. policy requires, and J.F. felt like her complaint was ignored. (Dkt. No. 148-9 at 11; Dkt. No. 147-7 at 4.)

**B. Count VI**

As to Plaintiff's Title VI claim, the same facts that support an informal custom for the purposes of *Monell* could lead to a jury finding of "intentional discrimination" based on the City's " 'deliberate indifference' to teacher or peer harassment of a student." *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 230 (D. Mass. 2015) (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F. 3d 655, 665 (2d Cir. 2012) (extending Title IX's deliberate indifference framework to Title VI)). Applying the Title IX deliberate indifference framework here, it is Defendant's burden to show that no jury

could find one or more of the following elements: "(1) that [Plaintiff] was subject to severe, pervasive, and objectively offensive harassment . . . on the basis of race, color, or national origin; (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits; (3) the funding recipient knew of the harassment; (4) in its programs or activities; and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Id.* (internal quotation marks omitted); *see id.* (collecting cases that extend the "deliberate indifference" framework of Title IX to Title VI); *Stand With US Ctr. for Legal Just. v. Massachusetts Inst. of Tech.,* 158 F.4th 1, 21 (1st Cir. 2025) ("Liability under Title VI requires that an appropriate person . . . with authority to take corrective action to end the harassment" have "actual knowledge" of the offending conduct.") (internal quotation marks omitted) (alteration in original); *Silva v. Town of Uxbridge*, 771 F. Supp. 3d 56, 70-71 (D. Mass. 2025); *Kestenbaum v. President & Fellows of Harvard Coll.,* 743 F. Supp. 3d 297, 307-308 (D. Mass. 2024).

While Defendant disagrees with Plaintiff as to whether Malvezzi's or A.M.'s comments had racial undertones and asserts that these comments could not have constituted severe, pervasive, and objectively offensive harassment, a jury could reasonably come out the other way. *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415 (5th Cir. 2015) (noting that when viewing facts in the light most favorable to the plaintiffs at summary judgment, a comment about "ethnic hair styles" was "clearly indicative of racial animus"); *see also M.R. v. Burlington Area Sch. Dist.,* No. 21-CV-1284-JPS, 2023 WL 3510642, at *16 (E.D. Wis. May 17, 2023) (finding, at the summary judgment stage, that comments about the plaintiff's hair were racial in nature or could be construed in that way). Moreover, even if these comments were race-neutral, the court finds the First Circuit's comment made in the Title IX context, that "in some cases one could use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct," applicable to the race-based conduct at issue here. *Morgan,* 823 F.3d at 745.

A jury could reasonably find that N.M. was deprived of an educational benefit based on the intensity of the harassment N.M. faced, which in at least some of the situations may be viewed as being race-based, the resulting anxiety N.M. suffered when at school, and her extensive absences. *See Zeno,* 702 F.3d at 667 (explaining that a jury could have reasonably found the plaintiff to have been deprived from an educational benefit due to the absence of a "supportive, scholastic environment free of racism and harassment"; his forced acceptance of a lesser-recognized high school diploma due to his incomplete studies as a result of his need to leave the school; and his early departure from the school).

As to actual knowledge, a jury may consider Malvezzi and A.M.'s comments together with the racially-charged texts exchanged within the N.H.S. Cheerleader Snapchat group, which N.H.S. was aware of but could not recall if they were investigated, that immediately precipitated R.I.'s physical attack. Furthermore, N.M. consistently mentioned to Stone the race-based issues she faced, and construing the facts in the light most favorable to Plaintiff, there is no evidence showing that her complaints to Stone were acted upon.

As to the deliberate indifference standard under Title VI, it "does not require that a school take any particular disciplinary action or that the response be successful in eliminating all instances of harassment." *Silva,* 771 F. Supp. 3d at 71. Rather, the school's "response to known harassment [must be] so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Stand With US Ctr. for Legal Just.,* 158 F.4th at 22. Here, Plaintiff has adequately contended that the insufficient actions taken to address the racial harassment could be seen as clearly unreasonable. *See id.* The harassment Plaintiff faced "continued and even escalated throughout the year, suggesting that Defendant[] either failed to effectively implement remedial measures or failed to take additional reasonable measures after learning that the initial measures were defective." *Silva,* 771 F. Supp. 3d at 71-72. Such circumstances raise "a genuine dispute as to whether

Defendant[] crossed the line from an imperfect response to deliberate indifference by failing to take additional measures when they learned that the harassment was continuing." *Id.*; *see also Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007) (explaining the deliberate indifference standard in a Title IX context as where a school "had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective"); *see also Grace,* 85 F.4th at 12 (finding at summary judgment as to a Title IX claim that the plaintiff had "produced sufficient evidence for a reasonable jury to find that the school exhibited deliberate indifference by repeatedly characterizing [a peer's] treatment of [plaintiff's son] as 'peer-to-peer conflict' as opposed to bullying in light of [the peer's] constant aggressive behavior towards [her son]").

**C. Count VII**

As to Plaintiff's First Amendment and MDR Article 16 retaliation claim, she must first prove that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating fact in the adverse action." *D.V. ex rel. Elisabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citations omitted).

First, as to Leydon's comments to the DCF investigator, while there is evidence to indicate that knowledge of these comments chilled Plaintiff's freedom of speech, there is no evidence to indicate that Leydon's comments chilled N.M.'s freedom of speech. The record does not support a reasonable inference that N.M. was informed about Leydon's comments to the DCF investigator. Rather, when asked at her deposition as to the effect of Leydon's comment to the DCF investigator, Plaintiff stated that she and N.M. were "reporting consistently about what was happening . . . how [N.M.] was being directly targeted, [but] that didn't garner the protection . . . she deserved" from Leydon. (Dkt. No. 148-13 at 4.) Plaintiff did not testify that she ever told N.M. about Leydon's

comments to the DCF investigator or that N.M. ever learned about them. Ultimately, Plaintiff cannot recover her own damages based on the alleged retaliation that N.M faced in the form of Leydon's comments since she cannot show that N.M.'s freedom of speech was chilled as a result. *See Roble-Vazquez v. Tirado Garcia*, 110 F.3d 204, 206, n.4 (1st Cir. 1997) ("First Circuit case law holds that surviving family members cannot recover in an action brought under Section 1983 for deprivation of rights secured by the federal constitution for their own damages from the victim's death unless the unconstitutional action was aimed at the familial relationship.").

Second, the court also rejects Plaintiff's argument that a jury could reasonably find the disciplinary actions taken against N.M. constituted an "adverse action," because there is no evidence in the record to indicate that N.M.'s or Plaintiff's bullying complaints were the "substantial or motivating factor[s]" driving the disciplinary measures. *D.V. ex rel. Elisabeth B.*, 675 F.3d at 43. Rather, even when viewing the facts in light most favorable to Plaintiff, a jury would be compelled to find that N.M.'s behavior, which included swearing at staff and slamming a door shut on a staff member's arm, pushing another student in front of a staff member, calling a school official a derogatory term, and kicking a student in the leg, was the primary reason for the disciplinary actions she endured. (Dkt. Nos. 147-18; 22; 24.) *See Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989) (finding at the summary judgment stage that "[w]here a chilling effect is speculative, indirect or too remote, finding an abridgment of First Amendment rights is unfounded" (citations omitted)).

Plaintiff also asks the court to consider other incidents, including Leydon's "abrupt and disrespectful" reaction to Plaintiff raising the Snapchat photo of J.F. and Leydon during a school meeting. (Dkt. No. 126 at 25 (citing Dkt. No. 127 ¶¶ 88-89)). However, nothing in the record suggests that N.M. was aware of Plaintiff raising the J.F. Snapchat incident or of Leydon's reaction. Therefore, it cannot reasonably be inferred that her freedom of speech was chilled. *See Sullivan*, 888 F.2d at 4.

Finally, Plaintiff has not offered any legal authority to support the proposition that Leydon's inaction in addressing the J.F. Snapchat incident, even when viewed together with other incidences of Defendant's inaction, rise to the level of adverse action. *See, e.g.*, *Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (noting in the context of a qualified immunity analysis, that no caselaw cited was "directly on point that supports the theory that deliberate indifference by school officials to sexual harassment and bullying by fellow students can be a retaliatory adverse action under the First Amendment"); *L.H. v. Pittston Area School Dist.*, 130 F. Supp. 3d 918 (M.D. Pa. 2015) (finding at the summary judgment stage that a "mere failure" of school officials to act on a particular complaint would not "deter a person of ordinary firmness from engaging in, or continuing to engage in, the First Amendment activity of presenting complaints to school officials"), *aff'd,* 666 F. App'x 213 (3d Cir. 2016); *Finley v. County of Martin,* , No. C-07-5922 EMC, 2009 WL 5062326, at *15-*17 (N.D. Cal. Dec. 23, 2009) (finding that a failure to conduct an adequate investigation of discrimination claim was not sufficient adverse action to sustain a retaliation claim).

Moreover, even if the court were to consider other alleged instances of Defendant's inaction in response to Plaintiff's and N.M.'s bullying reports, as alleged in Plaintiff's complaint, Plaintiff's failure to cite any legal authority or develop an argument to support when such instances or general attitude of inaction can constitute adverse action in a First Amendment context is fatal to her claim. *See Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC,* No. CIV. 09-11873-LTS, 2014 WL 1278012, at *15 (D. Mass. Mar. 26, 2014) (finding that "[t]he failure to develop this argument in briefing the summary judgment motions is fatal to this claim."); *see also Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 678 (1st Cir.1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived.").

Based on the same analysis, Article 16 of the MDR claim is also dismissed. *See Roach v. Green*, No. CV 14-13515-RGS, 2016 WL 1254236, at *2 n.4 (D. Mass. Mar. 29, 2016) ("The protections of

art. 16 of the [MDR] are coextensive with those of the First Amendment." (citing *Hosford v. Sch. Comm. of Sandwich*, 659 N.E.2d 1178, 1180 n.5 (Mass. 1996))).

**D. Count VIII**

As to Count VIII (Wrongful Death Claim), in its July 1, 2024, Memorandum and Order ("M&O"), the court adopted Judge Robertson's recommendation and held that Plaintiff had satisfied the presentment requirement set forth in Mass. Gen. Law ch. 258, Section 4 because Plaintiff presented her claim within two years of N.M.'s passing away. (Dkt. No. 48 at 11-13.) Moreover, the court also agreed with Judge Robertson that Section 10(j) of Mass. Gen. Laws ch. 258, which sets forth an exception to an exclusion of sovereign immunity, applies. (*Id.* at 15-16.) Specifically, the court agreed with Judge Robertson that the September 10, 2019, Safety and Supervision Plan constituted an explicit and specific assurance sufficient to satisfy Section 10(j)(1)'s immunity exception. (*Id.* at 15.) Finally, the court found that a duty of care exists between a public school and a student at foreseeable risk of suicide. (*Id.* at 16-21.) Defendant has not raised any new legal arguments as compared to the motion to dismiss stage and has not pointed to the existence of absence of evidence in the record to support a different conclusion at this stage. Accordingly, the court sees no reason to differ in its holding from the July 1, 2024, M&O.

## V. CONCLUSION

Accordingly, Counts V (14th Amendment Claim), VI (Violation of Title VI of the Civil Rights Act of 1964 Claim), and VIII (Wrongful Death Claim) survive summary judgment. Parties shall be prepared to discuss during the September 9, 2026, status conference whether they are interested in mediation or, in the alternative, potential trial dates.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge